**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL SMITH | 24 CR 504 (JGK) |

# SENTENCING MEMORANDUM OF MICHAEL SMITH

Noell P. Tin (admitted *pro hac vice*)
Emily D. Gladden (admitted *pro hac vice*)
TIN FULTON WALKER & OWEN, PLLC
301 E. Park Avenue
Charlotte, NC 28203
Telephone: (704) 338-1220
Email: ntin@tinfulton.com

Justine A. Harris
Anna Estevao
HARRIS TRZASKOMA LLP
125 Broad Street, 10th Floor
New York, NY 10004
Telephone: (212) 970-6465
Email: jharris@harristrz.com

*Attorneys for Michael Smith*

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. MR. SMITH'S PERSONAL HISTORY AND CHARACTERISTICS ..... 5

A. Mr. Smith's Childhood and Family Circumstances ..... 5

B. Music Has Always Been a Centerpiece of Mr. Smith's Life ..... 9

III. THE OFFENSE CONDUCT AND PLEA AGREEMENT ..... 10

IV. THE GUIDELINES CALCULATION ..... 13

V. THE COURT SHOULD SENTENCE MR. SMITH TO PROBATION ..... 14

A. A Non-Custodial Sentence Is Warranted Because Mr. Smith's Offense Caused *De Minimis* Loss to Any Individual Victim ..... 15

B. The Nature and Circumstances of the Offense, Together with Mr. Smith's Record of Good Deeds, Make Clear that a Sentence of Incarceration is Not Necessary ..... 23

C. Mr. Smith's Ongoing Need to Provide for his Family and Dependents Merits Leniency ..... 28

D. A Term of Imprisonment Is Not Required to Achieve General Deterrence ..... 31

VI. CONCLUSION ..... 35

# I.
# INTRODUCTION

Mike Smith is a devoted father of six, a creative entrepreneur and musician, and an infinite source of positive energy and optimism. Despite a challenging childhood and personal history, as well as the enormous stress of these proceedings and the devastation it has wrought on his family, Mr. Smith continues to focus daily on being present for those that need him most—his wife and six children, and his ailing mother-in-law.

Mr. Smith pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. As the Court knows, this conviction stems from a multi-year effort to artificially stream his own music, as well as music created using AI, in order to maximize royalty payments. Specifically, Mr. Smith created bot accounts on various platforms and developed software that used those accounts to continuously stream a catalogue of his own music, and, eventually, music created using AI tools. This activity took advantage of a feature of the music streaming industry that distributes royalty payments to musicians on a per-stream basis, with each stream averaging a tiny percentage of a cent.

Although his conduct began when music streaming was just emerging and there was no consensus that artificial streaming was prohibited, it came to be viewed as an industry-wide problem. Rather than close down his sophisticated operation, Mr. Smith engaged in increasingly deceptive tactics to sustain his artificial streaming. He switched streaming platforms and music distributors when his tracks came under scrutiny. He sought to avoid detection by creating thousands of additional tracks with the assistance of AI, which, while not itself illegal, distributed his billions of streams among some 200,000 songs, thus lowering the number of streams for any particular song in an effort to stay under the radar. And, when asked directly whether he used any artificial means to stream his music, Mr. Smith lied, asserted all of his

streams were real, and affirmatively disclaimed any streaming abuse, fraud, illegal streaming, or artificial inflation.

It is unclear whether artificial streaming actually mattered to the streaming platforms that both profited from and financially incentivized it. When Mr. Smith began to artificially boost his music, most streaming platforms did not prohibit the activity in their terms of service despite its common practice in the industry. It was not until 2023—the end of the offense conduct period—that the regulations governing digital mechanical royalties were amended to exclude payments for artificial streams. Nevertheless, even in the uncertain regulatory landscape, it was Mr. Smith's misrepresentations that allowed his operation to continue, enabling him to reap substantial dividends and diluting the total royalty pool.

For this, Mr. Smith is profoundly sorry. He has accepted full responsibility for his conduct and pled guilty to a felony. His recommended Guidelines are 46-57 months, and he will be subject to $8,091,843.64 in forfeiture (far more than the net profit he derived from the offense). While the Probation Department recommends a below-Guidelines sentence of 24 months, in this case any term of incarceration would be greater than necessary to further the goals of sentencing, and the Court should impose a non-custodial sentence.

*First*, while the Guidelines recommend a substantial term of imprisonment, they are largely driven by an $8 million loss amount that purportedly aggregates *tiny, immeasurable losses* incurred by millions of songwriters and recordings artists who each received a "very small amount" less in royalty payments than they would have but for the offense. PSR ¶¶ 38, 42, 126. The Sentencing Commission previously authorized a downward departure where the "aggregate loss amount [] is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims." Former U.S.S.G. § 2B1.1 cmt. (n.21(C)) (reproduced in Ex.

B).[1] That is exactly what happened here. Indeed, the logic underpinning the Sentencing Commission's commentary is perhaps *uniquely* applicable here, given that Probation concedes that given the way royalties from digital music streaming are calculated, the harm to any individual artist was likely "insignificant." PSR p. 33. Because of the complex and opaque formula by which streaming royalties are calculated, it would be "difficult or impossible" to ascertain the *de minimis* amount of royalties each "victim" lost out on as a result of the offense conduct. *Id.* ¶ 38. Courts have long recognized that the loss-driven fraud Guidelines are an extremely poor proxy for culpability, and that is especially true in this case.

*Second*, it is highly relevant to the question of sentencing that Mr. Smith did not set out to commit a federal crime. In the murky regulatory world of music promotion, he believed his initial efforts to be lawful; indeed, Mr. Smith consulted with a well-known music attorney with extensive experience in legal operations at music publishing companies. Although he ultimately ended up rationalizing conduct that he knew was wrong—false statements to distributors and increasingly deceptive conduct to avoid scrutiny—his conduct began at a time when the legal parameters were unsettled. Indeed, every one of the dozens of the letters submitted to the Court in support of Mr. Smith confirms that he is not inherently a bad person. Just the opposite: countless good deeds make clear that at base, he is kind and generous, and his first instinct is to help those who are struggling. Mr. Smith's generosity comes in virtually every form—financial assistance, housing, job opportunities, emotional support, love, and perhaps most importantly, his simple consistent, uplifting presence. As one of Mr. Smith's friends and supporters puts it,

[1] Formal departures were deleted from the Guidelines Manual beginning with the November 1, 2025 amendments, and this language was moved to Appendix B. However, this amendment was not intended to "reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence." U.S.S.G. Appendix B, Part III.

"Mike is one of those rare people that you come across during life who brings light and joy to everybody around him. The good deeds and altruism that he shares with the world are immeasurable and I know that he still has an endless supply to give." Ex. A at 39-40 (J. Kane Letter). While he made serious mistakes here, those mistakes do not define him as a person, and his fundamentally good character should assure the Court that he presents no risk to the public going forward.

*Third*, any term of incarceration would wreak havoc on Mr. Smith's close-knit and loving family. Mr. Smith has six children and an aging mother-in-law who each rely on him. He is especially close with his 15-year-old son, whose development will suffer profoundly if Mr. Smith receives a custodial sentence. A custodial sentence would also make the family's tenuous financial situation even more strained and make it more difficult for Mr. Smith to satisfy his $8,091,843.64 forfeiture obligation. Mr. Smith had an enormously difficult childhood and has strived to ensure that his children do not face the same sorts of challenges that he did. A custodial sentence would force Mr. Smith's family to endure the same cycle of instability that Mr. Smith himself faced in his youth. Additionally, incarceration is unnecessary here given the other forms of punishment Mr. Smith already faces, including the very large forfeiture judgment, which he will work tirelessly to repay for the rest of his life.

*Finally*, despite the novelty of this prosecution—and indeed in part because of its novelty—general deterrence does not require a term of incarceration. This prosecution is the first of its kind, despite that streaming manipulation has been rampant for years. As a consequence, this prosecution has received widespread media attention in the popular press, music industry publications, and amongst court-watchers. The message that streaming fraud can lead to federal criminal prosecution has plainly been sent, and a custodial sentence will do little or nothing to

further amplify that message. Indeed, a custodial sentence is especially unlikely to have any marginal deterrent effect here because streaming manipulation is a systemic, global problem rooted in the incentives created by the digital music streaming royalty system and can therefore only plausibly be curbed by industry-level reforms.

## II.
## MR. SMITH'S PERSONAL HISTORY AND CHARACTERISTICS

### A. Mr. Smith's Childhood and Family Circumstances

Mr. Smith grew up under challenging circumstances. His mother, a Cuban immigrant, became pregnant while still in high school. His parents married and had Mr. Smith's older brother, Jack, when they were both just 17 years old. Mr. Smith was born three years later, in 1972. The young family relocated multiple times before moving to Sparta, New Jersey, where his father found a job in chemical sales. But his mother suffered from mental issues and was unprepared to be a mother of two. When Mr. Smith was just eight years old, his mother "snapped" and moved out of the house, seeing her children only once a week thereafter. PSR ¶ 70.

When she was present, Mr. Smith's mother was extremely volatile and even violent toward him and his brother. *Id*. Mr. Smith recalls that when Jack was 11, the dog escaped while he was letting it out—when he told his mother, she hit him over the head with a frying pan, knocking him unconscious. She hit Mr. Smith too, but he soon noticed that she would hit them with whatever was in her hand at the time she received bad news, so he strategically would tell her things he knew might upset her when she was folding laundry.

Living with his dad as a single parent also posed significant challenges. *Id.* ¶ 71. His dad worked long hours and left the house before dawn. Mr. Smith would get himself ready for school on his own, make his own breakfast, pack a lunch for school, and get himself to the bus stop. He

and his brother were alone and unsupervised for long periods. *Id*. Mr. Smith learned to be independent and self-reliant from a young age.

Left without any supervision, Jack started drinking and partying at the house with other older teenagers while their dad was at work. It fell on Mr. Smith's shoulders to clean the house and mitigate harm. Mr. Smith also suffered from Jack's increasing dysfunction. Jack bullied him and beat him daily. Mr. Smith had to wear glasses for a year to correct vision in his left eye because his brother hit him so hard. Eventually, [redacted].

During high school, Mr. Smith moved back in with his mom, who had started a new family with his stepfather, Paul. They had three young children, ages 1, 2, and 4. Mr. Smith's stepfather Paul was prone to extreme violence. When Mr. Smith was 15, Paul choked Mr. Smith so hard that the blood vessels in his eyes burst, nearly killing him. *Id.* ¶ 73. Mr. Smith was sure his mother would leave, but she told Mr. Smith she couldn't because she would not be able to survive and support three young kids by herself. Money was a huge stressor in the home and Mr. Smith was expected to pitch in. When Mr. Smith had four months left of high school, foreclosure proceedings were initiated on the family's home. Mr. Smith's mom moved to Pennsylvania, leaving Mr. Smith to stay on a friend's couch to finish out the year and graduate. *Id*.

Despite all these challenges, Mr. Smith developed a sunny, optimistic, resilient disposition. To this day, he exudes positive energy, motivating not just himself but everyone around him.

School was a refuge from Mr. Smith's chaotic home life and a place where he excelled. He took AP classes and got top grades, despite his chaotic home life, and being forced to move six times during high school (attending three different schools). *Id.* ¶ 90. After graduating, he

attended the University of North Carolina at Greensboro and graduated with a degree in finance, paying his way through the entire time. *Id.* ¶ 91.

Upon graduating from college, Mr. Smith worked at brokerage firms in Greensboro. *Id.* ¶ 104. But he quickly grew bored. With a highly technical mind, he was attracted to emerging computer technologies and taught himself how to code. As the concern about Y2K was starting to spread, Mr. Smith was intrigued and his problem-solving brain got to work. He studied the problem and devised a tool that identified places in computer code that needed to be fixed (instances where there was a two-digit year and a mathematical formula). Just 24 years old with a degree in finance, Mr. Smith was an unlikely candidate for a technical feat of this magnitude, but his tool worked, and a global technology company offered him a contract to perform this service for many of its clients.

Though successful, the utility of his product was short-lived. After Y2K, Mr. Smith tried to go into business with his father purchasing radiology equipment, but was unsuccessful. *Id.* ¶ 100. In 2003, recognizing the lack of accessible medical care in his area, Mr. Smith started an urgent care office near where he lived in North Carolina. *Id.* ¶ 99. He grew the business to multiple locations in North Carolina over several years, all while starting a family. Mr. Smith got married and had two children, C. in 2004 and A. in 2007. But both Mr. Smith and his ex-wife were unhappy in the marriage and separated in 2009. (Mr. Smith and his first wife stayed close and amicable as co-parents (and remain so today). *Id.* ¶ 75.).

Soon after his separation, Mr. Smith reconnected with his college sweetheart, Erika, and they have been together and deeply in love ever since. Ex. A at 1-2 (Er. Smith Letter). At the time, Erika also had young children (5-year-old twins and a 2-year-old). Together with Mr. Smith's 5- and 2-year-old, they blended their families. Their kids gelled right away—they are

still best friends today at 22 and 19 years old. In addition to the five children from their previous marriages, Mr. Smith and Erika had a son together, who is now 15 years old and a sophomore in high school. As many of the letters from Mr. Smith's friends and family attest, Mr. Smith raised Erika's children as his own. "He loved them, guided them, provided stability, and accepted complete responsibility for raising them. He also made the significant financial commitment to help provide each of them with a college education, never treating them as anything other than his own children." Ex. A at 37 (G. Battalia Letter); *see also id.* at 34 (G. Locks Letter).

His daughter El. writes:

> From the moment he came into our lives, he loved B[.], Ev[.] and I as if we had always been his children. . . . I have always said that my dad "saved us." He saved us from growing up without knowing what it felt like to have a father who loved us unconditionally. He gave us a home where we felt safe. We grew up knowing we were loved, protected, and wanted.

*Id.* at 13 (El. M. Letter). B. and Ev. say the same. *See id.* at 20-21 (B. M. Letter); *id.* at 17 (Ev. M. Letter).

Mr. Smith's son C. writes:

> My dad, Michael Smith, has been one of the single most influential people in my life. . . . In my childhood, he always ensured that I grew up in a loving and supportive environment. He always prioritized my wellbeing and invested countless hours towards my growth. For example, my dad coached my brothers and I in about every single sport imaginable. Not only did this leadership change our lives for the better, but numerous friends of mine across our community remember my dad supporting them and helping them develop as an athlete. Furthermore, my siblings and I could always count on him to be at every event in our lives no matter the sacrifice it requires. As I grew older, my dad's support shifted more towards helping me become a wise and considerate man.

*Id.* at 19 (C. S. Letter). Ev. writes, "I can confidently say he sets the standard for fatherhood." *Id.* at 17 (Ev. M. Letter).

Mr. Smith's family is at the absolute center of his heart and identity. He is deeply involved in all aspects of parenting. *See e.g. id.* at 19 (C. S. Letter); *id.* at 20-21 (B. M. Letter);

*Id.* at 22 (A. S. Letter). Given Mr. Smith's experience as a child, he intentionally built his work around his family instead of the other way around. He is a present, dependable, calm, light-hearted, and loving father and husband. He could not possibly be prouder of his wife and children or love them any more.

**B. Music Has Always Been a Centerpiece of Mr. Smith's Life**

Mr. Smith has loved music his entire life. He learned to play guitar at 4 years old, and throughout his life, music was a joyous outlet and a much-needed escape from his troubled home life. PSR ¶ 95. He joined his first band in 7th grade, and his high school band played local gigs and opened for well-known bands like Blues Traveler and Warrant.

Mr. Smith released his first album, called *Love Interrupted*, in 2013. Music has always been Mr. Smith's passion, and he longed to focus on music full-time. Mr. Smith was the driving force behind the TV show *One Shot*, a reality hip-hop talent search and competition series that aired on BET in 2016. *Id.* ¶ 97. Twenty thousand people auditioned across many states. Mr. Smith poured his heart and soul into the show and paid the $100,000 prize money to the winner out of his own pocket. Over the next several years, Mr. Smith focused on his own music, writing and releasing multiple records.

As with other areas of his life, Mr. Smith's extraordinary generosity stood out to those who interacted with him in the music industry. DJ King Tech, who worked with Mr. Smith on *One Shot* writes:

> One of the things I will always remember about Mike is watching him work with artists on the streets. I saw him spend day after day giving people his time, encouragement, and support—often without being paid and without asking for anything in return. He simply wanted to help people, give them a chance, and make them feel valued.

Ex. A at 71 (K. Tech Letter).

As another former collaborator, Robert Diggs (p/k/a RZA), explains, "I have seen him use his connections and resources to help people who might not have had those chances otherwise." *Id.* at 70 (R. Diggs Letter). "For example, [Mike and his family] have helped formerly incarcerated people find fair jobs and get a true second chance to return to society in a positive way." *Id.*

When Mr. Smith opened his own recording studio in Nashville, he "regularly opened the doors to songwriters so they could work in a quiet, supportive environment at no charge, and he often arranged for the sessions to be catered. When independent artists passed through Nashville performing at smaller venues, he offered them free recording sessions and provided an engineer to help ensure professional results." *Id.* at 49 (D. Leman Letter).

Mr. Smith would often "help people who were facing personal difficulties simply because he wanted to, without any expectation of repayment; only the hope that they would use the support wisely." *Id.* When Mr. Smith encountered an artist named Preston Wayne, who "had significant talent but no budget," Mr. Smith offered him free studio time and arranged for a highly regarded producer to fly to Nashville to record with Preston. *Id.* When it was time to release the music, Mr. Smith funded promotional campaigns that "helped the records gain strong traction." *Id*. Mr. Smith also "placed Preston on a record featuring Snoop Dogg, which remains Preston's most significant feature." *Id*.

## III.
## THE OFFENSE CONDUCT AND PLEA AGREEMENT

Since he was a child, Mr. Smith dreamt of being a successful musician. As the music industry started to shift to online streaming in the mid-2010s, Mr. Smith saw it as an opportunity to gain success as an independent artist. Like many other independent musicians, he believed that he could upload his music on streaming platforms and be on equal footing with others, whether

signed to a major record label or not. But the more he learned about the music industry, the more he understood that it was not an even playing field. He learned that songs would usually only gain traction across various algorithms, and be placed in playlists,[2] based on the number of streams that had already accumulated, and that it was widely reported that the major labels and publishers gave themselves a leg up by utilizing artificial streaming and other techniques. *See, e.g.*, Lucas Shaw, *Bots at Work: Did Fake Views Make Badshah's 'Paagal' Most-Viewed Video on YouTube?*, The Economic Times (Aug. 1, 2019), https://economictimes.indiatimes.com/magazines/panache/bots-at-work-did-fake-views-make-badshahs-paagal-youtubes-most-viewed-video/articleshow/70474924.cms; Paul Resnikoff, *Major Label CEO Confirms That 'Playlist Payola' Is a Real Thing…*, Digital Music News (May 20, 2016), https://www.digitalmusicnews.com/2016/05/20/playlist-payola-real-killing-artist-careers/; Ashley King, *French Montana Gets Busted for Fake Spotify Streams — Denies Any Involvement*, Digital Music News (Jan. 6, 2020), https://www.digitalmusicnews.com/2020/01/06/french-montana-fake-streams/; *Why Not Fake Your YouTube Views?*, Penny Fractions (Aug. 14, 2019), https://pennyfractions.ghost.io/why-not-fake-your-youtube-views/. In other words, the more streams a song already had, the greater exposure it would receive.

When Mr. Smith first created a "bot" to artificially stream his music, it was simply to gain traction, an attempt to beat the algorithm and eventually generate authentic popularity. He

[2] A "playlist" on a streaming platform is a curated collection of songs, assembled either by the platform's editorial staff, by algorithms, or by users, which serves as one of the primary vehicles through which listeners discover and consume music. *See Types of Spotify Playlists*, Spotify for Artists, https://support.spotify.com/us/artists/article/types-of-spotify-playlists/ (last visited Sept. 21, 2026). Placement on a popular playlist is critical to an artist's streaming success because it exposes a song to potentially millions of listeners and triggers the platform's recommendation algorithms, which in turn generate further streams—making playlisting, in essence, the streaming-era equivalent of radio airplay. *See A Guide to Spotify Editorial Playlists*, Artist.Tools (Nov. 23, 2025), https://www.artist.tools/post/a-guide-to-spotify-editorial-playlists (describing how placement on curated playlists "can easily translate into millions of new streams, practically overnight").

thought he could use artificial streams as kindling leading to greater exposure so that his songs would reach a wide audience and eventually take off organically. Through trial and error, Mr. Smith created a functional "bot"[3] to stream both his own songs and other songs within catalogs he owned and/or controlled. PSR ¶¶ 17-20. He soon came to see artificial streaming as not just a way to gain traction for his songs, but also as an opportunity to collect royalties.

During this early period, when artificial streaming was a relatively new concept, Mr. Smith did not think he was violating the law. Indeed, streaming manipulation was not prohibited by most platforms' terms of service. *Id.* ¶ 11 (music streaming platforms generally "did not explicitly prohibit streaming manipulation or artificially promoting content using 'bots' in the terms of service in the early years of the offense conduct" and "terms of service evolved over time"). And, from Mr. Smith's perspective, it was common practice, including among the major record labels. Mr. Smith also consulted with a well-known, experienced music industry lawyer. At the time, it seemed as if the issue could go either way. After all, the streaming platforms profited from increased streams and subscriptions and appeared to condone artificial streaming by turning a blind eye.

But then, over time, the music industry shifted in the other direction. Although, even at the end of the offense period, not all streaming platforms prohibited artificial streaming (*id.* ¶ 11), certain streaming platforms began changing their terms of service to address streaming manipulation and music distributors periodically asked Mr. Smith about the accuracy of his streaming data. *Id.* ¶¶ 32-36. When confronted, instead of revealing the true nature of his streams, Mr. Smith denied using bots and continued collecting revenue on his artificial streams.

[3] While referred to as a "bot," it was really just sets of computer code and applications that automated the process of logging into streaming accounts and playing music—essentially replicating what any listener does manually—but doing so continuously. Mr. Smith created numerous "bot" streaming accounts to replicate this process at scale.

*Id.* ¶¶ 33-34.[4] Rather than fold up his operation, he engaged in more and more deceptive tactics to keep the true nature of his streams hidden. Although he convinced himself that he fell within some legal loophole, he knew that he was cheating the system. For this, he is extremely sorry.

On March 19, 2026, Mr. Smith pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. *Id.* ¶ 1. The offense carries a maximum sentence of five years. *Id.* ¶ 113. A probationary sentence of between one and five years is authorized. *Id.* ¶ 118; *see* 18 U.S.C. § 3561(c)(1). As part of the plea agreement, Mr. Smith has also agreed to forfeit $8,091,843.64 (PSR ¶ 124), representing an estimate of the total gross revenues he obtained from artificial streams, less an estimate of the amounts he paid into streaming platforms by purchasing account subscriptions.

## IV.
## THE GUIDELINES CALCULATION

The Sentencing Guidelines were calculated as follows: a total offense level of 23, resulting from a base offense level of 6 (U.S.S.G. §§ 2X1.1(a), and 2B1.1(a)(2)), plus 18 levels because the offense involved a loss more than $3,500,000 but less than $9,500,000 (U.S.S.G. § 2B1.1(b)(1)(J)), plus two levels because the offense involved over ten victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)), plus two levels because the offense involved sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)), less three levels for acceptance of responsibility (U.S.S.G. §§ 3E1.1(a) and (b)), and less two levels for zero-point offender status (U.S.S.G. § 4C1.1). With a total offense level of 23 and a criminal history category of I, the advisory guideline range is 46 to 57 months in custody. Recognizing that there are strong mitigating factors in this case, including those related to Mr. Smith's lack of criminal history, difficult upbringing, and familial responsibility

[4] Sometimes, Mr. Smith's music lawyer engaged with third parties on Mr. Smith's behalf, including in connection with accusations that Mr. Smith engaged in streaming manipulation. See PSR ¶¶ 36(b)-(c) & n.2.

(PSR pp. 32-33), Probation recommends a below-Guidelines sentence of 24 months imprisonment, followed by two years of supervised release.

## V.
## THE COURT SHOULD SENTENCE MR. SMITH TO PROBATION

As the Court knows, district courts have an "overarching duty 'to impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)). These purposes, set forth in 18 U.S.C. § 3553(a)(2), are:

> [T]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). "[C]alculating the correct Guideline range [is] 'just an initial step in the sentencing process,'" *United States v. Al Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014) (citation omitted). A "district court may not presume that a Guidelines sentence is reasonable." *Id.* (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)).

Indeed, the Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Pepper*, 562 U.S. at 487-88 (citations omitted) (alterations in original). Finally, the Second Circuit has stated that "a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (cleaned up).

### A. A Non-Custodial Sentence Is Warranted Because Mr. Smith's Offense Caused *De Minimis* Loss to Any Individual Victim

A sentence of probation is appropriate here because, notwithstanding the substantial *aggregate* loss calculation and its outsized impact on the Guidelines range, the impact of Mr. Smith's offense was so diffuse that no individual "victim" suffered more than *de minimis* harm as a result of his conduct. PSR ¶ 38, 42, 126. Under such circumstances, the Sentencing Commission has expressly authorized a below-Guidelines sentence, and courts in this Circuit routinely exercise their authority to sentence far below the Guidelines in diffuse-loss cases—even in cases involving a far greater loss and conduct that is, unlike here, within the heartland of the fraud statutes. Indeed, the degree to which the loss-driven Guidelines range overstates the seriousness of the offense is profound in this novel case, given that no individual victim suffered *any* noticeable harm as a result of Mr. Smith's conduct, notwithstanding the PSR's $8,091,843.64 aggregate loss calculation.

1. As the PSR explains, Mr. Smith's offense resulted in—at most—tiny, likely "insignificant" losses to recording artists and songwriters who obtained royalties from streaming platforms. PSR p. 33; *see also id.* ¶ 38. Each one of these victims received "a *very small amount* less in royalties from the Revenue Pool" as a consequence of Mr. Smith's conduct.[5] *Id.* ¶ 42 (emphasis added); *Id.* ¶ 38 ("Because of the scheme involved streaming fraud, each and every artist/songwriter received *slightly less* royalties out of the Revenue Pool as a result.") (emphasis added).[6]

[5] The PSR appears to use "Revenue Pool" and "Royalty Pool" interchangeably.

[6] As discussed further *infra* at V.D, these *de minimis* losses were not unique to Mr. Smith's offense, but rather part of what has been recognized as a ubiquitous, industry-wide problem.

These extremely diffuse losses—and the fact that no victim suffered any real harm—flow from the *pro rata* royalty payment system applicable to digital streaming platforms. Music streaming royalties are generally paid to songwriters and recording artists based on the *proportion* of the artist/songwriter's streams relative to the total number of streams on the platforms, with each stream typically generating a fraction of one cent per stream for the artist/songwriter.[7] *See id.* ¶¶ 7-10. Each time a user streams a recording by one recording artist/songwriter, that user theoretically increases the total number of streams on the platform (*i.e.*, both the numerator and the denominator increase), thereby decreasing (ever so slightly) the total royalties paid to each artist/songwriter other than the authors of the song that the user streamed. Thus, when one artist/songwriter attracts a large number of streams—legitimately or artificially—every other artist will be paid a smaller share of the royalties (although the total revenue pool itself may increase). Although precise numbers are not publicly available, the total number of monthly streams on each digital streaming platform is, without question, enormous. Spotify, for example, has 777 million users who stream music, and over 100 million tracks available.[8] As a result, the effect each individual stream of one artist's song has on every other artist's share of total streams is not akin to a drop in a proverbial bucket—it is a drop in an ocean.

Here, the artificial streams attributable to Mr. Smith were, without a doubt, miniscule compared to the overall number of streams on any streaming platform. Mr. Smith's conduct therefore had, by any measure, a minute effect on any given artist's share of overall platform streams. Indeed, Probation concedes that each individual loss was both (1) "low or insignificant"

[7] Spotify, for example, "pays roughly $0.003–$0.005 per stream total." PSR ¶ 38.

[8] *About Spotify*, Spotify Newsroom, https://newsroom.spotify.com/company-info/ (last visited Sept. 21, 2026).

(PSR p. 33), and (2) unknowable, given the tiny numbers involved and the complex and opaque manner in which royalty payments are calculated. *See* PSR ¶ 38 (explaining that "it would be difficult or impossible to know the exact amount of reduced royalties that any individual artist did not receive as a result of the offense" given the "many factors" that go into royalty calculations"). For that reason, the government is not seeking restitution on behalf of any artist/songwriter-victim. *Id.* ¶ 126. And unsurprisingly, not a single recording artist or songwriter has submitted a victim impact statement, despite the fact that this prosecution and Mr. Smith's guilty plea received widespread media attention.[9] That is because no individual artist or songwriter suffered any perceptible harm from Mr. Smith's conduct.

The Sentencing Commission has expressly authorized a downward departure where, as here, the aggregate loss is large but diffuse on the grounds that in diffuse-loss cases, the Guidelines offense level substantially overstates the seriousness of the offense. That is clearly the case here. Indeed, this case is perhaps uniquely appropriate for a substantially below-Guidelines sentence on this basis, given the substantial loss calculation, the large number of victims, and the absence of any real harm to any such "victim."

The comments to former § 2B1.1 (reproduced in Ex. B) provide:

> There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.
>
> For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is

[9] The PSR discusses a "victim impact statement" submitted, along with a request for restitution in the amount of $250,000, by B.R. The $250,000 represents a sum B.R. purportedly loaned to Mr. Smith in July 2024—before this case was initiated—as an investment in a separate podcast company. PSR ¶ 43. B.R. contends that the podcast company intended to rely on fraudulent streaming, and that Mr. Smith failed to disclose that his track-record of streaming success was based on fraud. *Id.* As an initial matter, B.R. is not a victim under the MVRA and is not entitled to restitution. Nor is he a victim under the CVRA and has no right to be heard during these proceedings. In any event, to the extent the Court even considers it, Mr. Smith's business plan did not involve bots, and repayment of the loan B.R. made is not due until July 31, 2027. Mr. Smith has every intention of repaying the loan before that date.

> substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted.

*See* Former U.S.S.G. § 2B1.1 cmt. (n.21(C)).

While the 2025 amendments to the Guidelines Manual removed departures and placed these provisions in Appendix B, the Commission has explained that this amendment was intended to be "outcome neutral" and that the rationale underlying departures still applies under 18 U.S.C. § 3553(a):

> [T]he removal of departures from the Guidelines Manual does not reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence. The removal of departures does not limit the information courts may consider in imposing a sentence and it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a).

U.S.S.G. Appendix B, Part III.

District courts within the Second Circuit have frequently exercised their authority to sentence far below the Guidelines in diffuse-loss fraud cases. For example, in *United States v. Adelson*, the Southern District of New York imposed a 42-month sentence despite a Guidelines calculation that produced an offense level of 55—off the Guidelines table entirely—in a securities fraud case where the aggregate loss to thousands of shareholders was $260 million. 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (remarking on "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."). In *United States v. Parris*, the Eastern District of New York sentenced two defendants to 60 months despite

a Guidelines range of 360 months to life, in a securities fraud case involving approximately 500 victims. 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008). The court criticized the Guidelines' one-shoe-fits-all approach to victim counts and found that the Guidelines produced results inconsistent with sentences in far larger frauds. *Id.*

In *United States v. Abiodun*, the Second Circuit affirmed a six-level downward departure in a credit card fraud scheme involving over 1,200 victims and aggregate losses exceeding $25 million. 536 F.3d 162, 170 (2d Cir. 2008) (vacating and remanding on other grounds). And in *United States v. Algahaim*, the Second Circuit remanded for consideration of a non-Guidelines sentence where the loss enhancement tripled the base offense level in a SNAP benefit fraud case. 842 F.3d 796, 800 (2d Cir. 2016). The court held that the unusual structure of the fraud Guidelines—starting at base level 6 and letting loss become the principal determinant—entitles a sentencing judge to consider a non-Guidelines sentence. *Id.*; *see also United States v. Milton*, No. 1:21-cr-00478 (ER), ECF No. 322 at 26:1-3, 89:6-7, 98:18-23 (S.D.N.Y.) (imposing 48-month sentence in securities fraud case involving thousands of victims and aggregate loss over $550 million, yielding a Guidelines range of 324-405 months; noting that it would be "ludicrous" to impose a Guidelines sentence).

This case provides an even more extreme example of diffuse loss than a securities fraud in which the loss to each victim was "relatively small"—the example provided in the Guidelines. Here, Probation acknowledges that each victim's loss was not only small, but likely "insignificant." PSR p. 33. In short, despite that "[t]he Government believes that the victims could easily number in the millions" (PSR ¶ 42), Mr. Smith's offense caused no real harm to any individual.

For similar reasons, the two-level enhancement because there were more than ten victims, U.S.S.G. § 2B1.1(b)(2)(A)(i), also overstates Mr. Smith's culpability and is a poor fit for diffuse-loss cases. The enhancement is designed to address situations involving real harm to real victims, recognizing that the number of victims harmed constitutes an aggravating factor. Where the number of victims is so large such that no single victim suffered any actual loss, it is a poor measure of the nature of the harm.

2. Even putting to the side the diffuse nature of the loss here, the fraud Guidelines themselves have been criticized on the grounds that they "place undue weight on the amount of loss involved in the fraud," *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004), and that such emphasis is a poor vehicle to understand defendants' actual culpability. *See, e.g.*, Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, 29 Fed. Sent'g Rep. 226, 227 (2017) ("[I]t should be obvious that in a great many, perhaps most, cases, . . . the amount of the loss does not fairly convey the reality of the crime or the criminal."); Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent'g Rep. 167, 168 (2008) ("For the small class of defendants . . . convicted of fraud offenses associated with very large Guidelines loss calculations, the Guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.").

Empirical studies have found "that loss is an unsound measure of the seriousness of many offenses." Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013); *see also United States v. Mohammed*, 315 F. Supp. 2d 354, 357 (S.D.N.Y. 2003) ("[A]cross a wide range of diverse types of schemes and thefts, the amount of the loss . . . may be a less accurate proxy for the seriousness of the offense."). The fact that the fraud loss

Guidelines are not based on empirical data or any other clearly articulated rationale makes a Guidelines sentence that is predominantly based on loss amount calculation presumptively unreasonable. *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the . . . Commission . . . effectively guaranteed that many such sentences would be irrational on their face.").

The effect of overlapping enhancements in fraud cases like this one can further distort the Guidelines range away from a just or rational result. This is particularly true where the loss amount is substantial, because "[m]ost fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive." *United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003). In fact, because of the royalty payment system used by streaming platforms, described above, streaming fraud of *any* sort *necessarily* causes some hypothetical loss to every recording artist and songwriter who obtained royalties from streaming platforms (*i.e.*, "likely millions of victims" (PSR ¶ 38)). For this reason, the PSR subjects Mr. Smith to a 2-level enhancement because there were over ten victims, plus a *further* 2-level enhancement for sophisticated means, each in addition to the applicable *18-level* enhancement for loss—even though no victim was meaningfully impacted by his offense. *See* PSR ¶¶ 48-50. The implication that these substantial enhancements bear any meaningful connection to the principles underlying sentencing strains credulity.[10]

---

[10] The loss-driven Guidelines calculation in this case is also detached from the actual profits Mr. Smith obtained from the offense. The $8,091,843.64 loss figure was calculated by taking the gross royalties Mr. Smith received and subtracting "estimates of royalties he obtained from legitimate/organic streams of his music and estimates of the amounts that [he] returned to the royalty pools by purchasing many music streaming accounts." PSR ¶ 37. But substantial portions of the royalties Mr. Smith received were used to pay (1) music distribution companies he engaged to facilitate distribution of his music on streaming platforms (*see id.* ¶¶ 12-13), (2) to purchase songs to stream (*see id.* ¶ 27), (3) recording artists, (4) for internet services, (5) for promotion, and (6) other costs.

3. Not only is a sentence of probation warranted by the facts, but it would be consistent with Congress's directive that non-carceral sentences are generally appropriate for first-time offenders similarly situated to Mr. Smith.

In the Sentencing Reform Act, Congress directed that non-carceral sentences were generally appropriate for first-time offenders where the offense is not a "crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). This Congressional directive was bolstered by empirical data that recidivism rates for those with zero criminal history points were significantly lower than for those with even one criminal history point. *See, e.g.*, U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 27 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.

Mr. Smith is a non-violent first-time offender who committed an economic crime which caused no calculable loss to any victim. It is difficult to imagine a defendant to whom § 994(j)'s pronouncement regarding the propriety of a non-custodial sentence is more apt.[11] With zero criminal history points and a non-violent and not otherwise serious offense, Mr. Smith is among the least likely offenders to recidivate and among those Congress intended to receive a non-custodial sentence. For this reason and the others that follow, this Court should impose a variance through § 3553(a) and sentence Mr. Smith to probation.

[11] The Guidelines commentary to § 5C1.1 explains that for certain "zero-point offenders" (like Mr. Smith) whose Guidelines range is in Zone A or B of the Sentencing table, "a sentence other than a sentence of imprisonment . . . is generally appropriate." U.S.S.G. § 5C1.1 cmt. (n.9). The commentary does not, however, state that Congress's directive regarding non-custodial sentences applies *only* to defendants in Zones A or B, and not to other first-time offenders who commit non-serious, non-violent offenses. In any event, although Mr. Smith's offense level technically places him outside Zones A and B, that is entirely the result of the irrational fraud loss enhancement discussed above, absent which Mr. Smith would fall squarely within Zone A.

### B. The Nature and Circumstances of the Offense, Together with Mr. Smith's Record of Good Deeds, Make Clear that a Sentence of Incarceration is Not Necessary

As mentioned above, Mr. Smith profoundly regrets his actions. He knew it was wrong to lie and cheat. He makes no excuses for his conduct. Nonetheless, given the uncertain regulatory framework, the circumstances of the offense are mitigating. Moreover, Mr. Smith's long record of good acts and generosity of spirit make clear that he is fundamentally a good person, and a jail sentence is not needed to achieve individual deterrence.

1. First, it is significant that "[m]any of the Streaming Platforms did not explicitly prohibit streaming manipulation or artificially promoting content using 'bots' in the terms of service in the early years of the offense conduct" and "[t]he terms of service evolved over time." PSR ¶ 11. Even by the end of the offense period, in 2024, not all streaming platforms explicitly prohibited streaming manipulation. *Id.* The issue of artificial streaming and how it would be treated by the streaming platforms and regulators was evolving and the subject of conversation. It was an issue that everyone in the industry knew about, especially the streaming platforms. The fact that certain streaming platforms did not prohibit artificial streaming in their terms of service was not because it was overlooked. Rather, streaming platforms benefited enormously from increased streams, including artificial ones, and had not reached consensus about how to address it. *See, e.g.*, Spotify Technology S.A., 2018 Annual Report (Form 20-F) at 16 (Feb. 12, 2019), available at https://www.sec.gov/Archives/edgar/data/1639920/000156459019002688/ck0001639920-20f_20181231.htm#SIGNATURES (cautioning that streaming manipulation could inflate Spotify's "key performance indicators," and that the loss of these inflated numbers could cause Spotify's "stock price to drop significantly"); Ashley Belanger, *Real Humans Don't Stream Drake Songs 23 Hours a Day, Rapper Suing Spotify Says*, Ars Technica (Nov. 3, 2025),

https://arstechnica.com/tech-policy/2025/11/real-humans-dont-stream-drake-songs-23-hours-a-day-rapper-suing-spotify-says/ (noting that the MFFA—the first industry alliance formed to fight streaming fraud—was not founded until 2023 and remained "relatively nascent" as late as November 2025).

In this context, it is relevant that there was indisputably rampant streaming manipulation in the music industry. *See* Anna Nicolaou, *The Incredible Resilience of the Music Industry*, Financial Times (Sept. 8, 2023), https://www.ft.com/content/b85ab5af-bd03-4da8-971a-316e7c7897dc?syn-25a6b1a6=1 (estimating that "as much as 10 [percent] of all music streams are 'fake,' — deriving from streaming farms, where heaps of devices run services like Spotify on loop"). Of course, this is not offered as an excuse for criminal conduct. Rather, the fact that the practice was reportedly so widespread and conspicuous—including by big labels and publishers (*see supra* at III)—combined with the lack of prohibition in many terms of service explain why Mr. Smith set up this project in the first place. He did not set out to commit a crime; he thought he found a way to game a corrupt system that financially incentivized and profited from artificial streaming—a system that otherwise only served corporate interests. *See, e.g.*, *The Record Industry's Fake Fight Against Streaming Fraud*, Penny Fractions (Sept. 7, 2022), https://pennyfractions.ghost.io/record-industry-fake-fight-against-fraud/; *see also*, Liz Pelly, Mood Machine: The Rise of Spotify and the Costs of the Perfect Playlist 137-50 (2025) (describing the complexity of streaming platforms' *pro rata* model, and how major music companies are often guaranteed income and "other kickbacks" unavailable to independent artists and companies). He even consulted his entertainment lawyer, who had decades of experience and was prominent in the music industry, and was told that, at worst, his conduct could result in civil penalties. While his outright lies are inexcusable, as well as his sophisticated efforts to

avoid detection, it is nonetheless relevant that he began with the impression that streaming platforms both allowed and incentivized streaming manipulation.

Mr. Smith's communications with the Mechanical Licensing Collective ("MLC") are illustrative. In spring of 2023, the MLC confronted Mr. Smith about streaming manipulation and refused to pay him over $700,000 in mechanical royalty payments for streams over the prior few years. PSR ¶ 36. Mr. Smith and his lawyer pushed back, denying "play manipulation." *Id.* Of course, they should not have lied about the origins of the streams. However, it is relevant that Mr. Smith was arguably entitled to royalty payments for those streams, artificial or not. Indeed, the regulations governing the calculation of mechanical royalties were only amended in January 2023 to exclude streaming from artificial accounts.[12] Therefore, he was arguably entitled to those royalty payments (which remain in escrow to this day along with other royalty payments held back by MLC). While the fact that he had a claim to the royalty payments does not excuse his lies about it, it certainly mitigates the materiality of those misrepresentations.

2. Mr. Smith's individual characteristics make clear that he is not a bad person. He is 54 years old and has led a life principally characterized by generosity and kindness to others. Indeed, the nearly 40 letters submitted to the Court echo a consistent theme: Mr. Smith is a person whose kindness and generosity are beyond measure. *See e.g.* Ex. A at 69 (V. Tedeschi Letter) ("What I have always admired most about Michael is his character. He is loyal, dependable, compassionate, and deeply committed to the people he loves. His identity has

[12] *Compare* 37 C.F.R. § 385.2 (Jan. 1, 2023) *with* 37 C.F.R. § 385.2 (July 8, 2019), https://www.ecfr.gov/compare/2023-01-01/to/2022-12-31/title-37/chapter-III/subchapter-E/part-385/subpart-A/section-385.2; *Compare* 37 C.F.R. § 385.21 (Jan. 1, 2023) *with* 37 C.F.R. § 385.21 (July 8, 2019), https://www.ecfr.gov/compare/2023-01-01/to/2022-12-31/title-37/chapter-III/subchapter-E/part-385/subpart-C/section-385.21

always been rooted in being a devoted husband, a caring father, and someone who strives to lift up those around him.").

Mr. Smith helps those in need, quietly without ever expecting recognition or anything in return. One friend describes how Mr. Smith responded when their college friend Tim died [redacted] at the age of 30, leaving behind his wife Julie and young son Zack.

> In the months and even years that followed, Mike quietly stepped forward as a father figure to Zack. He invited Zack to spend time with his own children, providing companionship, guidance, and the presence of a positive father figure while Julie had the opportunity to grieve, manage her family's affairs, and begin rebuilding her life. Mike's support was never motivated by recognition or obligation—it came simply from his genuine concern for his close friends [ ] Tim and Julie.

*Id.* at 63 (C. Ohl Letter).

Others describe how he offered them jobs in times of need, "an opportunity to rebuild my life with dignity and purpose." *Id.* at 44 (D. Smith Letter); *Id.* at 47 (J. Smith Letter); Ex. at 80 (M. Grant Letter). Another tells how he offered housing at the most crucial time. A single mother with three children (who frequently served Mr. Smith and Erika at a local restaurant) mentioned to Mr. Smith and Erika that she was about to lose her home; Mr. Smith immediately arranged for her to stay at his rental home. *Id.* at 74 (V. Estevan Letter) ("When I think of Mike, I remember his devoted love for his wife, children and his generous heart.").

Another example of his astonishing generosity occurred when a friend suddenly lost her business and was facing "extraordinary financial hardship." *Id.* at 59 (K. Barnes Letter). Mr. Smith and Erika "generously gave us $75,000 dollars to pay our bills and secure housing. It was an extraordinary act of generosity and compassion that changed the course of our lives and the lives of our 3 children. I will remain forever grateful for the grace and kindness they showed us during one of our darkest times." *Id.*

When Mr. Smith's mother-in-law was [redacted] in 2020, Mr. Smith and Erika welcomed her into their home [redacted]. *Id.* at 10-11 (Er. Smith Letter); *Id.* at 24-25 (Ea. Smith Letter). "Each morning Mike would get up early to shop for the nine people who were living in his home. He helped me get up and down stairs to my bedroom. One night he got up in the middle of his dinner to find me chicken noodle soup [redacted]." *Id.* at 24-25 (Ea. Smith Letter). In 2026, when his mother-in-law had to [redacted], Mr. Smith went to great lengths to care for her:

> Mike made sure all my grandchildren came to see me . . . Mike welcomed me back in his home . . . He . . . helped me up the stairs and helped me learn to use my walker . . . When my doctor told me I could move back into my house Mike moved a bed into my sunroom so I wouldn't have to go up and down my stairs . . . Mike is one of the kindest men I have ever had the pleasure of knowing.

*Id*. These examples don't even scratch the surface of the countless ways Mr. Smith has touched people's lives.

In addition to his generosity, Mr. Smith has been extraordinarily devoted to his wife and children. As letter after letter states, Mr. Smith's family means everything to him. *See e.g. id.* at 49 (D. Leman Letter) ("I have rarely encountered someone as dedicated to his family's well-being"); *Id.* at 60 (N. Jackson Letter) ("Anyone who TRULY knows Mike knows he loves three things: his music, his family and his [wife] Erika"); *Id.* at 34 (G. Locks Letter) ("Something else that always stayed with me was the way he loved his family.").

All six children wrote letters to the Court, and in each one, their adoration for their father jumps off the page. *See e.g. id.* at 19 (C. S. Letter) ("He is someone we can all lean on and can look up to as a model of true character."); *Id.* at 17 (Ev. M. Letter) ("He's always been someone who I've looked up to [for] his musical talent, [ ] his amazing ability to light up a room, and his

undeniable selflessness."); *Id.* at 16 (D. S. Letter) ("[M]y Dad is not just my Dad, he is . . . my motivation, and one of the main reasons why I wake up every day grateful."); *Id.* at 14 (El. M. Letter) ("There is nobody in this world I adore more than my father.").

The impact Mr. Smith has had on his children's lives has been wholly good until now—his conduct and the public scrutiny of this case have hurt them and caused Erika great pain. Knowing his actions have harmed his family is something Mr. Smith will carry with him his entire life. The additional punishment of incarceration, which would separate him from his loving family and greatly impact Erika and the children, is not necessary to achieve the aims of sentencing.

The Court should weigh Mr. Smith's good deeds and positive characteristics when fashioning a sentence. *See Adelson*, 441 F. Supp. 2d at 513-14 ("But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"). Indeed, where a defendant has demonstrated fundamentally good character, "specific deterrence is not a major concern." *United States v. Ortega*, No. 09-CR-742-01, 2010 WL 2541364, at *2 (E.D.N.Y. June 17, 2010). This is especially true here, given that Mr. Smith recognizes his mistakes and has taken them to heart.

### C. Mr. Smith's Ongoing Need to Provide for his Family and Dependents Merits Leniency

In fashioning a fair and just sentence, this Court "must consider the impact that a prison term will have not only on [the defendant] but on her . . . children and [family]." *United States v.*

*White*, 301 F. Supp. 2d 289, 290 (S.D.N.Y. 2004) (in pre-*Booker* era, concluding that extraordinary family circumstances warranted downward departure). A below-Guidelines sentence is appropriate where a term of imprisonment may "wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing." *United States v. Johnson*, 964 F.2d 124, 129-30 (2d Cir. 1992); *see also United States v. Kon*, No. 04 CR, 271-03(RWS), 2006 WL 3208555, at *5 (S.D.N.Y. Nov. 2, 2006).

Even in the mandatory Guidelines era, it was well settled that where a defendant played an important role for dependent family members, a departure was warranted to "reduce the destructive effects that incarceration of a defendant may have on innocent third parties." *United States v. Milikowsky*, 65 F.3d 4, 7 (2d Cir. 1995); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming downward departure for defendant who worked to support wife and young children and cared for ailing elderly father because "close-knit family['s] . . . stability depend[ed] on [defendant's] continued presence").

Where, as here, a defendant is unlikely to reoffend and the defendant's family would be significantly harmed by incarceration, courts in the Second Circuit have routinely imposed non-custodial sentences. *See, e.g.*, *United States v. Gerard*, 782 F. Supp. 913, 914 (S.D.N.Y. 1992) (imposing sentence of five years' probation where defendant "is recognized by friends, family, and community religious leaders as a model parent who is totally devoted to her children").

Were Mr. Smith to be incarcerated, it would have a devastating impact on his family. Mr. Smith is the center of his kids' world and "the very heart of [the] family." Ex. A at 8 (Er. Smith Letter). Any period of incarceration would greatly affect all of them, but in particular on 15-year-old D., who still lives at home and needs his father.

D. was 13 when Mr. Smith was arrested in connection with this case. He has already experienced significant difficulty as a result of this case. Over the past two years, D. has "lost friends that he has known since he was young. . . . He has had people say disparaging and ugly things about his father. He has read horribly untrue things in the media and seen the tears our family has shed. He has had a very different experience than his siblings had when they were 15." *Id.* at 8-9 (Er. Smith Letter); PSR ¶ 81.

D. and Mr. Smith are incredibly close. Mr. Smith is involved in all aspects of his life, from helping him train for cross country to working with him on math homework, which is not his strong suit or Erika's. Ex. A at 8-9 (Er. Smith Letter). As the PSR explains, D. has [redacted]. PSR ¶ 80. His father's daily assistance in academic areas where he struggles could make a huge difference in his educational success. *Id.* ¶ 81. Moreover, this is a crucial time for his emotional development. "[T]here are things that I as a mother simply do not understand when it comes to a teenage boy. It will truly change who D[.] will be in this world if Mike is not present in his daily life these next few years." Ex. A at 9 (Er. Smith Letter). D.'s letter also makes clear what an enormous role his father plays in his life. *Id.* at 15 (D. S. Letter) ("he has made [my life] so much better").

Perhaps due to his own difficult and traumatic upbringing (*see supra* at II.A), Mr. Smith has been particularly focused on providing his blended family of eight the support, mentorship, and financial stability that he lacked as a child. As discussed above, Mr. Smith's early personal history was marked by instability, family strife, and sometimes violent abuse. He knows firsthand how hard it can be to grow up without a sense of security and unconditional love at home. He deeply regrets that, ironically, it is his own conduct that now threatens to deprive those

closest to him of the love, support, and stability that he has tried so hard to provide, leaving his family to face the same sorts of challenges he was forced to confront in his own childhood.

Further, Mr. Smith has always been the primary breadwinner. Were he to be incarcerated and not able to work, the already "challenging" financial situation his family is experiencing would be far worse. PSR ¶ 81. Two of the children are just beginning their sophomore years in college (Ev. at East Carolina University and A. at North Carolina State), and it will be very difficult for Erika to afford their tuition on her income alone.

**D. A Term of Imprisonment Is Not Required to Achieve General Deterrence**

Despite the novelty of this prosecution—and in part because of that novelty—general deterrence does not require a term of incarceration. This is the first criminal prosecution for music-streaming fraud in the United States. *See, e.g.*, Ethan Millman, *North Carolina Man to Pay $8 Million After Pleading Guilty In First-Ever Streaming Fraud Case*, The Hollywood Reporter (March 19, 2026), https://www.hollywoodreporter.com/music/music-news/north-carolina-pleads-guilty-in-first-streaming-fraud-case-1236541593/ (describing this as the first-ever criminal music-streaming fraud case, despite that "[s]treaming fraud has been a rampant issue in the music industry for years"). The indictment, guilty plea, and conviction have made clear that manipulating streams, concealing that manipulation, and collecting royalties through fraudulent means can result in a federal felony conviction. That message has been amplified by the enormous media attention this case has received as a consequence of the novel nature of the offense, and by the substantial forfeiture judgment to which Mr. Smith has agreed—$8,091,843.64, an amount that, as discussed above (at pp. 2 & 21 n.10), exceeds the net profit he derived from the offense. In short, it is *this case* that has functioned to put Americans on notice that this activity, which has for years been (and remains) rampant, can be a crime.

Indeed, in early January 2025, the Music Business Association (a prominent industry organization) hosted a full-day "Trust & Safety in Music Symposium" that "brought together thought leaders from the music, tech, legal & regulatory spaces to unpack the implications of the Michael Smith case and take the temperature of the music industry's response to fraudulent activity." *See* Ex. C, available at https://musicbiz.org/trust-safety-in-music-symposium-2025/. The symposium featured the former Assistant U.S. Attorney who led the team that brought this case, who remarked that "in this space, the indictment is enough to send a message."

This prosecution has *already* supplied precisely the warning that general deterrence is meant to provide: anyone considering similar conduct has now seen that it can lead to federal prosecution, public exposure, a felony conviction, and the loss of the proceeds at issue. A custodial sentence would serve little, if any further deterrent value. *See Adelson*, 441 F. Supp. 2d at 514-15 (observing that long custodial sentences are not necessary to deter white-collar crime).

Nor can a custodial sentence be realistically expected to meaningfully reduce the broader issue of streaming fraud. Streaming fraud is a multi-billion-dollar global problem. *See, e.g.*, Clovis McEvoy, *How AI-Generated Songs are Fueling the Rise of Streaming Farms*, WIPO Magazine (May 27, 2025), https://www.wipo.int/en/web/wipo-magazine/articles/how-ai-generated-songs-are-fueling-the-rise-of-streaming-farms-74310. Moreover, streaming fraud is overwhelmingly associated with organized criminal networks and bot farms operating outside the United States. India, Vietnam, Thailand, and parts of Eastern Europe have become "hotbeds of click-farm activity," and industry participants have concluded that "organised criminals are involved" in these operations. Eamonn Forde, *AI, Bot Farms and Innocent Indie Victims: How Music Streaming Became a Hotbed of Fraud and Fakery*, The Guardian (June 3, 2025), https://www.theguardian.com/music/2025/jun/03/ai-bot-farms-and-innocent-indie-victims-how-

music-streaming-became-a-hotbed-of-and-fakery; *see also São Paulo Court Finds Streaming Fraud Enabling Site "Boom de Seguidores" Liable in Another Operation Authêntica Victory*, IFPI (April 14, 2026), https://www.ifpi.org/sao-paulo-court-finds-streaming-fraud-enabling-site-boom-de-seguidores-liable-in-another-operation-authentica-victory/ (describing legal action to shut down Brazilian websites which sold streams on streaming platforms). These actors operate beyond the practical reach of American criminal jurisdiction; imposing a custodial sentence here will have no meaningful deterrent effect on a bot farm in Bulgaria or Brazil, or in any other country where the individuals and organizations committing streaming fraud have little reason to fear prosecution in the United States.

Streaming fraud is also a systemic problem rooted in the structure of the digital royalty system itself. It is not a problem that criminal prosecutions can plausibly solve one defendant at a time. Under the *pro rata* model used by Spotify and other major platforms, discussed above, subscription revenue is pooled and divided according to each artist's relative share of total streams. As the music industry has recognized, that simplicity—every stream counted equally—creates a financial incentive to generate enormous volumes of streams, regardless of whether the listening reflects genuine user demand. Indeed, JPMorgan analysts found that uploading a 30-second track and programming a phone to play it on repeat 24 hours a day could generate approximately $1,200 per month in royalties. *See* Anna Nicolaou, *The Incredible Resilience of the Music Industry*, Financial Times (Sept. 8, 2023), https://www.ft.com/content/b85ab5af-bd03-4da8-971a-316e7c7897dc?syn-25a6b1a6=1.

That incentive structure is an industry-wide problem requiring industry-wide solutions, and indeed, industry players are *already* pursuing such solutions outside the criminal legal system. Spotify, for instance, has introduced a 1,000-stream minimum threshold for royalty

eligibility and charges distributors a $10 fee per track when it detects fraudulent streams. *See Modernizing Our Royalty System to Drive an Additional $1 Billion Toward Emerging and Professional Artists*, Spotify for Artists (Nov. 21, 2023), https://artists.spotify.com/blog/modernizing-our-royalty-system; *see also Artificial Streaming*, Spotify for Artists, https://artists.spotify.com/artificial-streaming (last visited Sept. 21, 2026). Just this month, the International Federation of the Phonographic Industry (IFPI), a trade organization representing the recording industry worldwide, launched an initiative intended to establish a set of baseline industry practices for preventing stream manipulation. *See Music Companies Unite in New Commitment to Combat Streaming Fraud in Order to Protect Artists, Songwriters and Fans*, IFPI (Sept. 14, 2026), https://www.ifpi.org/music-companies-unite-in-new-commitment-to-combat-streaming-fraud-in-order-to-protect-artists-songwriters-and-fans/. These structural reforms—adjusting how royalties are allocated, removing fraudulent streams from the pool, increasing detection, and imposing platform-level financial consequences—are the tools capable of addressing the root causes of streaming fraud. No custodial sentence imposed on an individual American defendant can eliminate the incentives that drive billions of dollars in fraudulent activity worldwide.

These considerations also accord with the research on deterrence. The National Institute of Justice has found that "the chance of being caught is a vastly more effective deterrent than even draconian punishment" and that increasing the severity of punishment produces only limited additional deterrent effect. U.S. Dep't of Justice, Nat'l Institute of Justice, *Five Things About Deterrence* (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence. Empirical research establishes that potential offenders are influenced principally by their perception of the risk of being caught, not the severity of the punishment that might follow.

Katelyn Carr, *An Argument Against Using General Deterrence As A Factor in Criminal Sentencing*, 44 Cumb. L. Rev. 249, 262 (2014).

Here, this prosecution has already made the potential consequences of streaming manipulation concrete in the eyes of the public. Mr. Smith has been indicted, arrested, publicly identified, prosecuted, and convicted of a felony; he has agreed to a forfeiture judgment of more than $8 million that he will spend years or decades working to pay back; he has endured extensive media attention and the resulting professional and reputational consequences; and he been forced to sell his family home, where he raised his children—all in connection with a first-of-its-kind prosecution for conduct of a kind that remains rampant today. Those consequences, together with the public example created by this novel prosecution, are more than sufficient to satisfy the aims of general deterrence. A term of incarceration would not only be greater than necessary to achieve that purpose, it would also raise profound fairness concerns—one father should not be put behind bars to answer for an industry-wide problem that the streaming platforms themselves long tolerated, profited from, and only recently began to address.

## VI.
## CONCLUSION

For the foregoing reasons, we respectfully submit that a sentence of probation is sufficient, and not greater than necessary, to fulfil the purposes set forth in Section 3553(a)(2).

Respectfully submitted this 22nd day of September, 2026.

*/s/ Noell P. Tin*
Noell P. Tin (admitted *pro hac vice*)
Emily D. Gladden (admitted *pro hac vice*)
TIN FULTON WALKER & OWEN, PLLC
301 E. Park Avenue
Charlotte, NC 28203
Telephone: (704) 338-1220
Email: ntin@tinfulton.com

*Attorneys for Michael Smith*

*/s/ Justine A. Harris*
Justine A. Harris
Anna Estevao
HARRIS TRZASKOMA LLP
125 Broad Street, 10th Floor
New York, NY 10004
Telephone: (212) 970-6465
Email: jharris@harristrz.com

*Attorneys for Michael Smith*