**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K Javits Federal Building*
*26 Federal Plaza*
*New York, NY 10278*

September 28, 2026

**BY ECF**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Michael Smith*, 24 Cr. 504 (JGC)**

Dear Judge Koeltl:

The Government respectfully submits this letter in advance of the sentencing of Michael Smith, the defendant in the above captioned case. For years, Smith orchestrated a sophisticated fraudulent scheme that stole millions of dollars in musical royalties from rights holders. The Court should impose a sentence that adequately punishes the defendant for his fraud scheme and sends a message to others that streaming fraud will be met with significant punishment. For the reasons that follow, the Court should impose a substantial term of incarceration and one within the United States Sentencing Guidelines ("U.S.S.G.") range. The Court should also order the defendant to forfeit $8,091,843.64.

## I. Offense Conduct

This case involves the defendant's fraudulent scheme to steal millions of dollars of musical royalties by fraudulently inflating music streams on digital streaming platforms (the "Streaming Platforms") such as Apple Music, Spotify, Amazon Music, and YouTube Music. The defendant created thousands of "songs" using artificial intelligence ("AI") and then uploaded those "songs" to the Streaming Platforms. Smith then used "bots"—automated computer programs—to stream the AI-generated "songs" billions of times. At the height of his fraudulent scheme, Smith used over a thousand bot accounts simultaneously to artificially boost streams of his music across the Streaming Platforms. Indeed, according to streaming data, in April 2023, the entire Taylor Swift catalogue received 9.3 million streams on YouTube Music (based on family plan streams). Smith's catalogue, in comparison, received 80.9 million streams from family plans. By manipulating the streaming data in this manner, Smith fraudulently obtained more than $8 million in royalty payments to which he was not entitled. (PSR ¶ 6; Ind. ¶ 1).

### a. *The Music Streaming Industry*

Consumers stream music through the Streaming Platforms. Each time a song is streamed through one of the Streaming Platforms, the songwriter who composed the song, the musician who

performed it, and in certain cases other rightsholders, are entitled to small royalty payments. The exact amount of the royalty payments owed varies depending on several factors, but it is often less than one cent per stream. (PSR ¶ 7; Ind. ¶ 2).

The funds used to pay royalties to songwriters, composers, lyricists, and music publishers (the "Songwriters") are obtained from the Streaming Platforms. Generally, the Streaming Platforms are required to pay a certain percentage of their revenues (the "Revenue Pool") to Performance Rights Organizations ("PROs"), for the right to publicly perform songs (known as performance royalties), and to the Mechanical Licensing Collective (the "MLC"), for the right to digitally reproduce and distribute songs (known as digital mechanical royalties). The Streaming Platforms also send data on streaming activity along with the Revenue Pool, which is then used by the PROs and the MLC (collectively, the "Rights Organizations") to proportionally allocate and disperse payments from the Revenue Pool to the Songwriters whose songs were streamed during the same period that the Streaming Platforms earned the revenue. As a result, streaming fraud diverts funds from Songwriters whose songs were legitimately streamed by real consumers to those who use automation to falsely create the appearance of legitimate streaming. (PSR ¶ 8; Ind. ¶ 3).

The funds used to pay royalties to performing artists, record companies, or other sound recording distributors ("Artists") are also obtained from the Streaming Platforms. Like songwriter royalties, Streaming Platforms are generally required to pay a pool of royalties to Artists for the right to stream the sound recordings that embody musical compositions. This sound recording royalty pool is also often calculated as a certain percentage of Streaming Platform revenues, and the royalty pool is then allocated proportionally among Artists based on their respective percentages of total streams. These allocated royalty funds are then paid directly by Streaming Platforms to Artists (through the record companies and music distribution companies). Streaming fraud thus diverts sound recording royalties away from Artists whose sound recordings were legitimately streamed by real consumers, in the same way that streaming fraud diverts musical composition royalties away from Songwriters. (PSR ¶ 9; Ind. ¶ 4).

b. *Streaming Fraud Generally*

The Streaming Platforms have always prohibited fraudulent activity on their platforms. Over time, as streaming manipulation developed, the Streaming Platforms amended their terms of service explicitly to prohibit streaming fraud. For example, one of the Streaming Platforms that the defendant distributed his AI "songs" to had User Guidelines that prohibited, "artificially increasing play counts or follow counts, artificially promoting Content, or other manipulation including by (i) using any bot, script, or other automated process." (PSR ¶ 11; Ind. ¶ 6).

Likewise, music distribution companies, which facilitate the distribution of artists' music to the Streaming Platforms, also prohibit streaming fraud. For example, a Manhattan-based music distribution company ("Distribution Company-1") used by the defendant to distribute his songs to Streaming Platforms required customers to "agree not to engage in (or to permit, encourage, enlist, retain, or employ third parties to engage in), activities that, in [Distribution Company-1]'s sole discretion, constitute Streaming Manipulation." Distribution Company-1's terms of service define streaming manipulation as "any activity and/or method which involves the artificial creation, by human or non-human means, of online or offline plays on audio and/or audio-visual streaming

services, where such plays do not represent bona fide end-user listening and/or views initiated by genuine consumers and taking place in the reporting country." (PSR ¶ 12; Ind. ¶ 7).

c. *The Defendant's Fraudulent Scheme*

The defendant's streaming fraud proceeded in three stages. First, the defendant, created thousands of accounts on the Streaming Platforms (the "Bot Accounts") that he could use to stream songs. Second, he used software to cause the Bot Accounts to continuously stream songs that he owned. Third, Smith collected royalties based on the fraudulent streams by the Bot Accounts. (PSR ¶ 16; Ind. ¶ 11(a)).

To create the Both Accounts, Smith obtained thousands of email accounts (the "Fake Email Accounts") that he used to create and register the Bot Accounts. Smith typically purchased the Fake Email Accounts from vendors who sold bulk email accounts. The Fake Email Accounts were often in the names of fictitious identities. Smith then used the Fake Email Accounts to create and register the Bot Accounts on the Streaming Platforms. Smith typically registered the Bot Accounts in fake names corresponding to the Fake Email Accounts. (PSR ¶¶ 17(a)-(b); Ind. ¶¶ 11(a)-(b)).

At certain points, Smith had as many as 10,000 active Bot Accounts on the Streaming Platforms. Signing up such a voluminous number of Bot Accounts on the Streaming Platforms was labor-intensive, and Smith paid individuals located abroad as well as coconspirators located in the United States to do the data entry work of signing up for the Bot Accounts. For example, in a May 11, 2017 email to a coconspirator ("CC-1"), Smith asked CC-1 to create Bot Accounts on a particular Streaming Platform: "Make up names and addresses[.] [J]ust make sure they all are the same for family member and also make sure everyone is over 18."[1] (PSR ¶ 17(c); Ind. ¶ 11(c).

In order to make it appear as if each Bot Account (or group of Bot Accounts within a single family plan) used a different source of payment, Smith used a Manhattan-based service ("Financial Service-1") that provided large numbers of debit cards, typically corporate debit cards for employees of a company. Smith lied to Financial Service-1 and provided it with dozens of fake names corresponding to the Fake Email Accounts and Bot Accounts, claiming that those fake names belonged to employees of his company. (PSR ¶ 17(e); Ind. ¶ 11(e)).

After registering the Bot Accounts, Smith then caused the Bot Accounts to continuously stream "songs" he owned. Smith used cloud computer services so that he could use many virtual computers at the same time. He used some of the Bot Accounts on each virtual computer at the same time. (PSR ¶ 18; Ind. ¶ 12).

To avoid anomalous streaming as to any single "song"—which might trigger the attention of the Streaming Platforms and others that police the industry—Smith sought to spread his artificial streams across hundreds of thousands of "songs." For example, in an October 4, 2018

[1] To maximize the streams by the Bot Accounts, the defendant typically paid for "family plans" on the Streaming Platforms, which are intended for members of the same family living in the same household and are the most economical way to purchase multiple accounts on the Streaming Platforms, since family plans typically cost less per user than individual plans.

email, Smith wrote, "in order to not raise any issues with the powers that be we need a TON of content with small amounts of Streams." In a December 26, 2018 email, Smith wrote, "We need to get a TON of songs fast to make this work around the anti fraud policies these guys are all using now." And in a May 9, 2019 email, Smith wrote, "I can't run the bots without content. And I need enough content so I don't overrun each song. That's the problem. If we get too many streams on one song it comes down." (PSR ¶ 21; Ind. ¶ 15).

To bypass the Streaming Platforms' "anti fraud policies" and to prevent the Streaming Platforms from "[taking] down" Smith's songs for violating those anti-fraud policies, Smith turned to AI to generate a "TON of songs."[2] In approximately 2018, Smith began obtaining hundreds of thousands of AI-generated "songs" to fraudulently stream. In an October 2018 email, Smith reported that he had generated hundreds of thousands of streams of the AI music and thereafter he obtained thousands of AI-generated "songs" each week. (PSR ¶¶ 25-26; Ind. ¶ 19).

Smith's fraudulent scheme was lucrative. In the beginning of the scheme, the defendant emailed himself a financial breakdown of how many streams he was generating each day and the corresponding royalty amounts. Smith wrote that he had 52 cloud services accounts, and each of those accounts had 20 Bot Accounts on the Streaming Platforms, for a total of 1,040 Bot Accounts. He further wrote that each Bot Account could stream approximately 636 songs per day, and so in total Smith could generate approximately 661,440 streams per day. Smith estimated that the average royalty per stream was half of one cent, which would have meant daily royalties of $3,307.20, monthly royalties of $99,216, and annual royalties of $1,207,128. (PSR ¶ 20; Ind. ¶ 14). By June 2019, Smith reported that "we are at 88 million TOTAL STREAMS so far!!!" Smith further explained that his fraudulent streams were earning approximately $110,000 per month." (PSR ¶ 27; Ind. ¶ 21).

In total, Smith obtained more than $14 million from musical royalty paying entities. The Government determined, and the defendant agreed, that the total approximate loss caused by the defendant's scheme is $8,091,843.64. This was calculated by subtracting amounts based on estimates of royalties he obtained from legitimate/organic streams of his music and estimates of the amounts that Smith had returned to the royalty pools by purchasing many music streaming accounts. (PSR ¶ 37).

d. *The Defendant's Repeated False Denials*

Throughout the pendency of the defendant's fraudulent scheme, Streaming Platforms and others that police the streaming industry confronted Smith with evidence that he was engaged in

---

[2] In addition to generative AI, Smith attempted other strategies to obtain enough music to operate his fraudulent scheme. Smith used the catalog of a music publicist to fraudulently generate royalty payments. Later, he attempted to sell his fraudulent streaming scheme as a service, in which other musicians would pay him for streams he would fraudulently generate or share royalties with him in exchange for fraudulent streams of their music. But neither strategy allowed Smith to gain access to the massive volume of songs the scheme needed in order to evade detection and succeed on a large scale. (PSR ¶ 23; Ind. ¶ 17).

streaming abuse. Each time he falsely denied the allegation.[3] on or about March 6, 2018, Distribution Company-1 informed the defendant that one of his songs "fit the criteria that is usually linked to store end streaming abuse." Smith responded, "I acknowledge what you wrote and I ask that you still release it. We have no intentions of committing streaming fraud." Later that same year, in or about October 2018, Distribution Company-1 advised Smith that it had received "multiple reports of streaming abuse from different stores" and, as a result, planned to remove Smith's releases from all stores. Distribution Company-1 further advised Smith, "engaging in fraudulent activity, including artificially increasing your stream counts in stores (commonly known as "streaming abuse"), is a violation of [Distribution Company-1's] Terms of Service." In response, Smith once again lied about his streaming fraud, claiming: "This is absolutely wrong and crazy! . . . There is absolutely no fraud going on whatsoever! How can I appeal this?" (PSR ¶ 33; Ind. ¶ 27).

As another example, in or about March 2019, one of the Streaming Platforms ("Streaming Platform-1") informed a music distribution company ("Distribution Company-3") that Smith was working with, that Streaming Platform-1 believed Smith had engaged in streaming fraud. When told of Streaming Platform-1's determination, Smith falsely told Distribution Company-3, "I have done NOTHING to artificially inflate the streams on my two albums. . . . I have not a done a thing to illegally stream my music. . . . I have not violated the terms of my agreement with you at all and you have provided no proof either. I have not illegally streamed my music." (PSR ¶ 34; Ind. ¶ 28).

Smith also lied to the MLC. In about March and April 2023, the MLC halted royalty payments to Smtih and confronted him about his fraud. In response, Smith and representatives acting on his behalf repeatedly lied to the MLC in an attempt to obtain the royalty payments. For example, on March 17, 2023, one of Smith's representatives emailed the MLC that "Mike categorically denies any play manipulation." On March 23, 2023, an attorney working for Smith wrote the following to the MLC:[4]

> [Smith's Representative ("Smith Representative-1")][5] and [an MLC employee] spoke yesterday. [Smith Representative-1] explained to [the MLC] how Mike is able to compose and record music so quickly. [Smith Representative-1] also

[3] Smith additionally lied to the Streaming Platforms when he used false information to create the Bot Accounts and when he agreed to abide by terms and conditions that prohibited streaming manipulation. Smith also deceived the Streaming Platforms by making it appear as if legitimate users were in control of the Bot Accounts (in the name of fake individuals) and streaming music when, in fact, the Bot Accounts were hard-coded to stream Smith's music billions of times.

[4] The PSR incorrectly implies that the author of this email was a non-lawyer representative and that Smith Representative-1 was a lawyer. To be clear, Smith's then-attorney authored this email. Indeed, as explained below, the Government understands the author of this email to be the same attorney as the "well-known music attorney with extensive experience in legal operations at music publishing companies" referred to in the defendant's sentencing submission.

[5] The Government interviewed Smith Representive-1 who confirmed that the defendant lied to Smith Representative-1, falsely claiming that Smith's streams were organic and that his music was not generated by machine.

> confirmed that ***none of Mike's works are computer-generated creations***. Mike is the 'human' author! . . . [MLC employee] noted that in October, 2021 and October, 2022, the bulk of Smithhouse Music Publishing's streaming activity at Amazon was almost entirely from Family Plan tier accounts. [MLC employee] raised concerns about this being statistically improbable. As Mike . . . and I have explained in our previous communications, ***Mike utilizes third-party music promoters to create awareness for his product and drive traffic to his release***s. These same promoters work with the major labels and their artists. . . ***There is no question that these promoters (again, the same ones engaged by the majors) only engage in legitimate, approved, industry standard practices . . . Mike and I maintain that the promoters that we work with are among the best in the music business, and they engage solely in approved industry standard practices***.

## II. Procedural History

On March 19, 2026, the defendant pled guilty, pursuant to a plea agreement, to an Information charging him with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371.

The parties agree on the following Guidelines calculation:

- Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level is six.
- Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), 18 levels are added because the offense involved a loss greater than $3.5 million but less than $9.5 million.
- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), two levels are added because the offense involved more than ten victims.
- Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), two levels are added because the offense involved sophisticated means.
- Pursuant to U.S.S.G. § 4C1.1(a), two levels are subtracted because Smith has no criminal history points and meets the other criteria set forth in section 4C1.1(a).
- Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, a three-level reduction will be warranted, pursuant to U.S.S.G. §§ 3E1.1(a)-(b).

In accordance with the above, the defendant's offense level is 23. Because Smith is in Criminal History Category I, his Guidelines range is 46-57 months' imprisonment. The defense requests a sentence of probation. (Dkt. 57). The Probation Office recommends a sentence of 24 months' imprisonment.

## III. Discussion

The defendant's conduct warrants a substantial custodial sentence of at least 46 months' imprisonment. Such a sentence is no greater than necessary to reflect the seriousness of the crime, provide just punishment, afford adequate deterrence, and to promote respect for the law.

*First*, a significant sentence is necessary to reflect the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A). Smith was the architect of, and led, a sophisticated and multi-faceted fraud scheme over the course of many years to divert musical royalties from legitimate and hard-working song writers and other rightsholders to himself. Smith pocketed more than $8 million of these royalties. For more than six years, Smith labored almost daily to perpetrate massive fraud. His deception took many forms. He falsely told the Streaming Services (thousands of times) that he would follow their rules. He created thousands of Bot Accounts in fake names with corresponding email accounts. He created and managed computer scripts on a daily basis to fraudulently stream his music billions of times. He created and obtained tens of thousands of AI-generated "songs" to fraudulently stream and ascribed to them fake titles and artists. He recruited and supervised others to work in his fraudulent scheme. And he repeatedly lied to the Streaming Platform, music distribution companies, the MLC, and others in the industry to conceal and promote his fraud scheme. Every day, for more than six years, Smith committed fraud. And he did it to obtain millions of dollars to which he was not entitled.

In addition to having all the hallmarks of the most serious white-collar crime: pre-planned and orchestrated conduct, sustained deception, obstruction to conceal the fraud, and massive losses (and gain to the defendant), the defendant's fraudulent scheme stole from hard-working (and often underpaid) songwriters, artists, and other rightsholders. As explained by the MLC, streaming fraud "redirects a portion of the existing royalty pool from every single legitimate rightsholder to fraudsters." (Ex. A). And the Music Fights Fraud Alliance explained that musical royalties that Smith fraudulently obtained "came at the expense of the creators whose rightful royalties were siphoned away [because] [e]very fraudulent stream perpetrated by Mr. Smith diluted the value of every legitimate stream occurring during the same accounting period. (Ex. B).

Smith argues for a non-custodial sentence, claiming that while he caused a substantial loss in the aggregate, no single victim sustained a large loss. (Dkt. 57 at 15). In support of this argument, Smith contends that the U.S.S.G. "has expressly authorized a below-Guidelines sentence, and Courts in this Circuit routinely exercise their authority to sentence far below the Guidelines in diffuse-loss cases." *Id.* That is, in cases where the loss is spread across many victims. None of the authorities the defendant cites support his argument. First, none of the cases cited by the defendant discuss "diffuse loss" or even reference the Guidelines provision cited by the defendant. In *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), the district court criticized a Guidelines sentence of life imprisonment in a securities fraud case where the defendant's conduct, while serious, did not warrant life imprisonment. There was no discussion or reliance on "diffuse loss." Here, the applicable Guidelines range is nowhere near life imprisonment and correctly accounts for the aggravating and mitigating factors. In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), the district court was critical of Section 2B1.1 enhancements that apply in almost

every securities fraud case and that quickly lead to Guidelines ranges disproportionate to the crime. There was no discussion of "diffuse loss." Here, there were only two sentencing enhancements. In *United States v. Abiodum*, 536 F.3d 162, 170 (2d Cir. 2008), the Circuit affirmed a six-level departure (even though the defendant had requested a greater departure) based on the overlap of Guidelines enhancements. There was no discussion or reference to "diffuse loss." Indeed, the Government has been unable to locate even a single case that granted a downward departure or variance based on "diffuse loss" citing the former application note relied on by the defendant.

Second, the Government submits that the Guidelines provision cited by the defendant, former application note 21(B)(C) to Section 2B1.1, does not support a downward variance in this case. The former application note pertains to cases where the offense level "substantially overstates the seriousness of the offense." The application note provides an example of a securities fraud case "involving a fraudulent statement made publicly to the market [that] may produce an aggregate loss amount that is substantial but diffuse." This case is very different from a securities fraud case involving false statements to the market typically resulting in massive losses spread across many shareholders and a relatively modest gain to the defendant. Take for example one of the cases the defendant cites, *Adelson*. The defendant was a former executive of a public company that made false statements to the public about the company's earnings. The total loss, based on a stock price decline of 88%, was $260 million (and a foreseeable loss of between $50 million and $100 million) spread across the company's thousands of shareholders. By contrast, based on the forfeiture order, the defendant only obtained $1.2 million.

These facts do not remotely resemble the facts here. Every penny of loss was diverted to the defendant. Put differently, the actual loss is the same as the defendant's gain, and while the loss may have been diffuse, the fraudulent proceeds were not—they all went into the defendant's pocket. Moreover, the defendant had full visibility into, and intended, every penny of loss. He even created profit and loss statements showing how much profit he could obtain from each bot he operated.

Next, the defendant argues that "it is highly relevant to the question of sentencing that Mr. Smith did not set out to commit a federal crime." In support of this claim, Smith claims that most Streaming Platforms did not expressly prohibit streaming manipulation when he started his scheme, and that he consulted with a "well-known, experienced music industry lawyer." (Dkt. 57 at 12). Both of these claims lack merit. First, whether or not the fine-print in the Streaming Platforms terms-of-service specifically called out streaming fraud through artificial streams as prohibited conduct back in 2017 when Smith first started his fraud scheme—and some did, including the world's largest streaming service, Spotify, which prohibited artificially increasing play count or otherwise manipulating the Services by using a script or other automated process—is beside the point. All Streaming Platforms prohibited fraud, and the defendant, based on his own contemporaneous admissions, knew his scheme was fraudulent and wrong.[6] For example, in a

[6] Smith claims that he initiated his scheme to get on a more equal footing with the major labels and publishers who "gave themselves a leg up by utilizing artificial streaming and other techniques." (Dkt. 57 at 11). In support of this claim, the defendant cites a 2019 article in *The Economic Times*. That article described the practice of using server farms and bots to artificially stream music as "stream fraud" and noted that the practice was widely condemned at the time.

December 2018 email—at the beginning of the fraud scheme—Smith wrote, "We need to get a TON of songs fast to make this work around the anti fraud policies these guys are all using now." In other words, as explained above, Smith spread his billions of artificial streams across many songs because billions of streams of just a few songs would be detected and would trigger the Streaming Platforms' "anti-fraud" policies. In addition, from the very beginning of the fraud scheme, Smith took great pains to conceal his conduct and avoid a paper trail leading to him. For example, he used false names to sign-up the Bot Accounts; he used virtual private networks (VPNs) to conceal the fact that the Bot Accounts were operating from his house; and Smith directed his coconspirators that the Bot Accounts and macros be "Unde[te]ctable: At least put every safety measure in to avoid detection." In short, the defendant's own words and conduct reveal that he knew from the very beginning that his scheme was a form of fraud. Yet, he perpetrated that fraud, on a daily basis, for more than six years.[7]

The defendant also claims he consulted a "well-known" entertainment lawyer who purportedly advised the defendant that "at worst, his conduct would result in civil penalties." (Dkt. 57 at 24). There is good reason to doubt this claim. As noted above, this attorney subsequently emailed the MLC and falsely asserted that Smith's songs were not AI-generated, that Smith generated large volumes of streams through third-party music promoters, and that the promoters engage solely in approved industry standard practices. Either Smith concealed from the lawyer pertinent facts, including that Smith's songs were generated by AI and Smith used computer programs to stream songs, or the attorney affirmatively lied to the MLC.[8] Either scenario undercuts the defendant's argument that he relied in good faith on the attorney's advice.

*Second*, general deterrence and the need to promote respect for the law are also critical concerns in this case. Streaming fraud is difficult and requires significant resources to detect. As the MLC explained in its letter to the Court, "identifying, investigating, and preventing [Smith's] fraud . . . required The MLC to devote substantial and ongoing investments of time, expertise, and resources" and even then Smith was able to divert royalties administered by other entities. (Ex. A). Investigating and preventing fraud diverts valuable resources and attention from the MLC's

---

[7] Remarkably, the defendant commenced his fraud scheme shortly after resolving allegations by the Justice Department, through the United States Attorney's Office for the Western District of North Carolina, that the defendant had engaged in fraud. The allegations arose from a lawsuit filed by a whistleblower under the *qui tam* provisions of the federal False Claims Act, claiming that Smith, who managed health clinics in North Carolina, knowingly billed Medicare for medically unnecessary procedures. Smith and his co-defendants settled the case for $900,000. See https://www.justice.gov/usao-wdnc/pr/owner-and-two-managers-health-care-practice-agree-pay-900000-resolve-allegations-0 (last visited Sept. 28, 2026). At the very least, Smith's earlier interaction with the justice system should have served as a warning and the need to be scrupulous when obtaining funds from others.

[8] During its investigation, the Government interviewed an individual known to Smith who informed the Government that after Smith's arrest, the individual asked Smith's attorney (believed to be the same "well-known" attorney referenced in the sentencing submission) whether the attorney knew Smith had been using bots. The attorney responded that they were unaware.

and similar agencies' core objectives: distributing royalties to hard-working and deserving rightsholders.

Moreover, sophisticated defendants who engage in long-term frauds—like Smith—are rational actors who typically attempt to think through the costs and benefits of their criminal conduct. The cost-benefit calculus must be such that that white collar criminals are deterred from committing such crimes, even after taking into account the chances that their crimes may evade detection altogether, and the only way to do that is by imposition of serious sentences. *See, e.g., United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime."); *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Stein*, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed."); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence."). The Second Circuit emphasized the importance of general deterrence in a recent white-collar case in which the Court remanded for resentencing, finding that the district court insufficiently weighed the importance of general deterrence. *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023) ("We have said . . . that consideration of general deterrence is especially important in the crimes of the sort that this case involves."). Here, imposing a substantial term of incarceration will send a clear message that defrauding social services programs, no matter who you are, will result in significant punishment.

Smith asserts that punishment is unnecessary to achieve general deterrence because the prosecution has already supplied a warning that similar conduct could lead to prosecution. (Dkt. 57 a 32). Smith claims that this message "has been amplified by the enormous media attention this case has received." (*Id.* at 31). But media attention only underscores the need for significant punishment. The defendant claims that music streaming is rampant in the industry. And in its letter to the Court, the Music Fights Fraud Alliance asserts that "streaming fraud has considerably grown" and given that this is the first criminal prosecution for streaming fraud in the United States, "the sentence the Court imposes will serve as the first real signal to the public regarding the actual legal consequences of streaming fraud." (Ex. B). If the public is watching this case, as the defendant claims, a lenient sentence will send precisely the wrong message: streaming fraud will not result in meaningful punishment. The Government urges the Court to send the opposite punishment.

Finally, in support of his request for no term of incarceration, the defendant cites several personal circumstances. The Court can and should consider those facts. As in every case,

incarceration will have devastating collateral consequences on the defendant's family. There is no doubt that will be the case here. Those consequences were brought on by the defendant and the defendant alone when he willfully engaged in fraud for more than six years to reap millions of dollars. While the defendant's incarceration will impact his family, that does not diminish the need for punishment here.

**IV. Conclusion**

The Government respectfully requests that the Court impose a substantial term of imprisonment of at least 46 months' imprisonment. In addition, consistent with the parties' plea agreement, the Court should order the defendant to forfeit $8,091,843.64.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: s/ Nicholas Chiuchiolo
Nicholas W. Chiuchiolo
Kevin B. Mead
Assistant United States Attorneys
(212) 637-1247/ -2211

cc (by ECF): all counsel of record