# EXHIBIT A

**Copyright + Technology Conference 2025**

Panel 1

# THIS MASQUERADE: STREAMING FRAUD AND COPYRIGHT

*with* ARUNI SONI,[1] PATRA SINNER,[2]
JON GLASS,[3] and KATHERINE REILLY[4]

*It has been estimated that as much as 10% of music streams are fraudulent and that the percentage is growing. This session explores the sizable chunk of this activity that has copyright implications, such as fraudsters submitting music by famous artists to streaming services and claiming it as their own. It examines these sources of streaming fraud and the roles that streaming services, independent distributors, labels, and technology providers can play in mitigating it.*

**Aruni Soni:** I'm a journalist at Bloomberg Law. I cover IP law, so it's a lot of copyright stuff. And I have covered one big streaming fraud case, which we will hear more about today. But maybe our panelists, if you'd like to introduce yourself, a couple sentences, what you do.

**Patra Sinner:** I'm Patra Sinner. I'm the general counsel for Symphonic Distribution. We are a global independent music distributor with offices and teams around the world. We represent artists, labels, and anyone who has music that they'd like to get out into the world, so many different entry points. Artificial streaming is obviously something that we're dealing with on a daily basis. So, appreciate the Copyright Society bringing attention to this and having this as part of the panel here.

---

[1] Aruni Soni is a reporter in the Bloomberg Industry Group newsroom and covers intellectual property law. She has previously covered financial markets and climate news. Aruni graduated from Columbia University with a degree in economics. *See Aruni Soni*, THE COPYRIGHT SOCIETY, https://copyrightsociety.org/bio/aruni-soni/ (last visited Nov. 17, 2025).

[2] Patra Sinner is General Counsel at Symphonic Distribution, a global, independent music tech company supporting creators and labels across 100+ countries and over 200+ monetization partners. At Symphonic, she leads legal strategy across everything from rights and royalties to AI, A&R, and data privacy—always with an eye toward enabling creators, not slowing them down. *See Patra Sinner*,THE COPYRIGHT SOCIETY https://copyrightsociety.org/bio/patra-sinner/ (last visited Nov. 17, 2025).

[3] Jon Glass serves as Senior Vice President, Head of Digital Legal Affairs at Warner Music Group (WMG). In this role, Jon leads the company's business & legal affairs efforts in support of WMG's digital initiatives, working closely with WMG's business development team. *See Jon Glass*, THE COPYRIGHT SOCIETY, https://copyrightsociety.org/bio/jon-glass/ (last visited Nov. 17, 2025).

[4] Katherine Reilly is a partner in Pryor Cashman's White Collar + Regulatory Enforcement Group. A seasoned trial lawyer and former federal prosecutor, Kate's practice focuses on white-collar criminal defense, regulatory investigations and enforcement, complex civil litigation, cybersecurity, and advisory services. *See Katherine Reilly*, THE COPYRIGHT SOCIETY, https://copyrightsociety.org/bio/katherine-reill/ (last visited Nov. 17, 2025).

**Jon Glass:** I'm Jon Glass. I'm the head of Digital Legal Affairs at Warner Music Group. My job is to lead the business and legal affairs department that negotiates all of our global catalog-wide digital distribution agreements. I've been working at Warner for 15 years, so I've seen the evolution of streaming fraud. So, I'm excited we're going to get to talk about that because it's a big problem that the industry has to address.

**Katherine Reilly:** I'm Kate Reilly. I'm a partner at Pryor Cashman in our white collar and regulatory enforcement group, so copyright adjacent is right for me. But the reason I'm really here is that I, before joining Pryor Cashman earlier this year, served for 11 years as an Assistant U.S. Attorney in the Southern District of New York.[5] I was chief of the Complex Frauds and Cybercrime Unit there, where I supervised the filing of criminal charges in the first-ever music streaming fraud criminal case.[6]

**Aruni Soni:** Great, thank you guys so much. So, kind of like Bill said, streaming fraud is becoming an increasingly complex and relevant problem for the music industry. This music data tracking firm Beatdapp[7] has said DSPs[8] say about 10% of global music streaming is fraudulent.[9] And according to Beatdapp, roughly $2 billion is taken out of artists' royalties a year because of streaming fraud.[10] And that's out of a streaming market that's valued at around roughly $46 billion, so it's a notable sum.[11] And so, as with everything else, AI is complicating the issue more, and the landscape is shifting really fast.

So, today we'll unpack how these schemes work, who is impacted, what enforcement looks like, and whether we need to rethink some of the fundamentals of the streaming model. So, I'd like to ask you guys first, maybe a basic question, but when did you first hear about streaming fraud? And can you explain to us what you understand it is and when it becomes a copyright issue? Do you want to start?

---

[5] June 2014 to January 2025.

[6] North Carolina Musician Charged With Music Streaming Fraud Aided By Artificial Intelligence, UNITED STATES ATTORNEY'S OFFICE SOUTHERN DISTRICT OF NEW YORK, https://www.justice.gov/usao-sdny/pr/north-carolina-musician-charged-music-streaming-fraud-aided-artificial-intelligence (last visited Nov. 18, 2025); *Sealed Indictment 24 Cr. 504*, UNITED STATES ATTORNEY'S OFFICE SOUTHERN DISTRICT OF NEW YORK, https://www.justice.gov/usao-sdny/media/1366241/dl (last visited Nov. 18, 2025).

[7] BEATDAPP, https://beatdapp.com/ (last visited Nov. 18, 2025).

[8] Digital [music] service providers, e.g., Spotify, Apple Music, YouTube Music.

[9] Kate Knibbs, *'A Billion Streams and No Fans': Inside a $10 Million AI Music Fraud Case*, WIRED, https://www.wired.com/story/ai-bots-streaming-music/ (last visited Nov. 17, 2025).

[10] Daniel Tencer, *Streaming Fraud Costs The Global Music Industry $2bn A Year, According To Beatdapp. Now It's Partnering With Beatport To Combat The Trend*, MUSIC BUSINESS WORLDWIDE, https://www.musicbusinessworldwide.com/streaming-fraud-costs-the-global-music-industry-2bn-a-year-according-to-beatdapp-now-its-partnering-with-beatport-to-combat-the-trend/ (last visited Nov. 17, 2025).

[11] *Music Streaming Market (2025 - 2030)*, GRAND VIEW RESEARCH, https://www.grandviewresearch.com/industry-analysis/music-streaming-market (last visited Nov. 17, 2025). This research covers revenue sources outside of music. The International Federation of the Phonographic Industry (IFPI) reported $20.4 billion in streaming revenues for recorded music in 2024; https://www.ifpi.org/wp-content/uploads/2024/03/GMR2025_SOTI.pdf at 7. CISAC reported €5.14 billion (about $6 billion) in global collections of musical composition royalties from streaming. https://www.cisac.org/cisac-global-collections-report-2025 at 12.

**Patra Sinner:** I would say I may have been a little bit of a late bloomer to this topic. Before I was general counsel for Symphonic, I was in private practice,[12] but I was also – I had an artist management company,[13] and I experienced this with one of my own artists, and I really didn't know what it was. He was an emerging artist, was doing really well. I was contacted sort of out of the blue by a marketing company, I believe based out of – they said they were based out of Texas. They wanted to sell us some marketing services, which we declined. They, in fact, turned on these marketing services for my client over a weekend and his streams went through the roof on a couple of tracks.

And I was terrified because I was like, "What is happening here? This seems not legitimate." And I was really worried that this was somehow going to negatively impact him, that the DSPs would take notice of this. We had a new release coming. But in that situation, as an artist and his manager, we didn't have knowledge of this. We didn't have tools to do anything about it. We didn't know if we should report it and bring further negative attention onto him. Thankfully, they turned it off within a few days and then, of course, wanted us to pay them because they were like, "Wasn't this great?" And we were thinking, "No, this was not great." And we didn't have any control over it.

But then, I arrived at Symphonic in late 2022, and at that time, our template contracts had addressed improper activity. And we sort of use improper activity to cover many different things, artificial streaming, copyright infringement, all the different types of improper activity that you might want to put under one umbrella. And this was around the time that Spotify was also discussing rolling out penalty fees that they would be issuing to distributors like us if they detected artificial streaming on a client. And we realized at that point, and very early on of me being there, that this was going to be a big issue that I was going to be facing on a daily basis.

And that hasn't changed since I arrived in 2022. And now, the improper activity section of our contract is about two pages long because – trust me, when I say no distributor or label wants this – they do not want this running through their pipelines. I feel like I can confidently speak for others. It's just a matter of what do you do about it. And we can try to unpack some of that today.

**Jon Glass:** Yeah. I would say I first heard of streaming fraud when streaming became a viable business model, and probably from the beginning of the Spotify era, starting in the early 2010s. For me, I think about streaming fraud in two ways. One is the misidentification, mislabeling, or altering of existing copyrighted content, which is obviously copyright infringement. But then, I think what Patra was talking about was artificial stream counts using marketing companies or bots to be able to artificially increase the number of streams that are played on a streaming service. So, I think that's how I'm looking at all of these questions, and that's my lens which I look at through this issue.

---

[12] Principal, Sodoma Law. *See generally Sodoma Law at 10: A Decade of Growth and Inspiration*, PR NEWSWIRE, https://www.prnewswire.com/news-releases/sodoma-law-at-10-a-decade-of-growth-and-inspiration-300794030.html (last visited Nov. 21, 2025).

[13] Co-Founder, Vista 22 Entertainment. *See generally* Mandy Dalugdug, *Patra Sinner Appointed General Counsel At Symphonic Distribution*, MUSIC BUSINESS WORLDWIDE, https://www.musicbusinessworldwide.com/patra-sinner-appointed-general-counsel-at-symphonic-distribution/ (last visited Nov. 21, 2025).

**Katherine Reilly:** I think the thing I have learned coming from outside the copyright world and outside the music business is there's a lot of ways to commit streaming fraud. And some of them are more directly copyright relevant than others, right? I think learning how music royalties are dispersed has been a real education for me and for my line prosecutors when we were working on this case. And frankly, just asserting claims to music you had nothing to do with, which is obviously a copyright issue, is part of that. It's a very basic fraud, but very hard to fight against, I think, at the royalty level.

I first learned about streaming fraud when we started looking at the *Michael Smith* case. And one of the fun parts about my practice, particularly as a prosecutor, is in any given day, we were doing investment fraud, tax fraud, healthcare, cybercrime. So, we got notice of the fact that this was a prevalent problem and one really growing in prominence in the music industry. And in fact, I think there had been some predictions at some industry conferences the year previous that criminal enforcement was coming.

And that was spot on because we looked at this problem and thought both, "This is a good test case" and "We can talk more about that specific case." But also, a big part of our goal as prosecutors is to do cases that are going to have a broader impact than one defendant. And this seemed like a problem that needed highlighting, and we needed people to understand that it could in fact be criminal.

**Aruni Soni:** Yeah. Katherine, can you talk to us more about that case and what bringing it looked like? How did you even begin to build a legal theory around that? And did it require a lot of creative legal connecting of the dots?

**Katherine Reilly:** Yeah, so I should say, and we got a little bit of this, but I am no longer with the Justice Department, so I'm certainly not allowed to speak on behalf of the Justice Department anymore. And I'm limited in what I can say about the case to what's public. But that's a lot, because there's a pending indictment, the case is pretrial. So, it was an incredibly interesting and difficult case to put together because first, it required sort of learning the music business, and how royalties are handled, and how the DSPs interact with artists and post content.

And then, it required collecting data about how songs were streamed, which had never really been done, I don't think, at this level before, and is incredibly time intensive.

And for all of the images you may have in your head of the big, scary government and law enforcement, this was quite literally sort of me and my two line assistants, and one FBI agent scrolling through spreadsheets. So, it was a lot of work. But the real challenge for us from a legal perspective was I think there was a perception, and you guys may be better able to speak to this than I am, that this was sort of a terms of service problem, or more of a civil issue.

You know the terms of service for any particular streaming provider say you can't post sort of AI-generated content of particular types. You can't use chatbots. You can't buy family plans that represent there for different users. And if you do that, you violated the terms of service. And so, we were really looking to understand if there was a criminal case we could bring that had all of those elements that we thought were so problematic, but also, was going to really clearly satisfy the requirements of a wire fraud claim. And this case, the *Michael Smith* case, I think really checked all of those boxes.

So, just to give you a little bit of overview, and I'll go fast, but this individual is a real artist. He wrote songs, performed them, but that was sort of not lucrative enough. So, he started using AI to generate just huge quantities of music. And anybody who sort of dug

one step deeper on what the music was could see that it was not sort of real tracks, right? So, things like the artists' names were often like XYZ1, XYZ2. The song names were often sort of Calypso 435, Calypso 835. And there were just thousands and thousands of these tracks. He was generating them using firms that assisted him with the AI. He was posting them to streaming providers.

And then, buying massive numbers of family plans, which are the most cost-effective way to do it, and hiring chatbot services outside the U.S. to click on his tracks. That is the core of what I think of as traditional streaming fraud. And he did it to the tune of about $12 million in royalties over the course of a few years. So, I think there are people who are sort of like, "Is this really worthy of doing a criminal prosecution? But he made a lot of money doing it." And we think that's frankly the tip of the iceberg, both for him and sort of more broadly.

And then, what was special about his case in terms of the legal requirements, because we wanted to make sure we were on very solid footing in terms of the traditional wire fraud statute, is both he and his management, and this is all outlined in the public indictment, when they were confronted by various players in the process, the streaming services, the royalty providers, made representations that I think will be proven at trial, were clearly false: for example, "none of this is AI music"; "none of this is streaming fraud"; "these are all real clicks."

And I think that's helpful because the core of federal criminal wire fraud is making a misrepresentation in order to obtain money or property. And I think the prosecutors are likely to take the position at trial that citing the terms of service and saying you won't do these things and then doing them is a misrepresentation. But having the affirmative lies to try to get the royalties, I think, puts the case on much stronger legal footing. So, that is the core of the facts. And I will say that this is a person who clearly never thought he would be subject to criminal prosecution.

So, this is again in the indictment, but there were email search warrants executed, and things like emails saying, "This isn't enough songs. We need more songs. How are we going to get all the clicks we want?" and spreadsheets outlining which songs are being clicked how many times and how many new songs they were adding.

So, it was a scheme that I think is actually sophisticated, but one that was not, I think, anticipating criminal enforcement. And look, the case is pending. So, I expect there will be motion practice. He has very talented defense lawyers, and I expect they will argue this is not a crime, it's a terms of service violation.

And we'll see how that unfolds. But I think the affirmative misrepresentations he made in trying to secure royalties put it on much stronger legal footing.

**Aruni Soni:** Jon, Patra, can you talk to us a little bit about what streaming fraud looks like? How do you spot streaming fraud? Are there things you've observed over the years that – Michael Smith used bots. Jon, you said you've seen streaming fraud even before AI was a thing, and a big part of Michael Smith's case was using AI-generated music. So, how do you spot streaming fraud?

**Patra Sinner:** I first want to say, I think this case is pivotal. And Kate and I were on a panel back in January, and I said the same thing. I feel like this will send a clear message that there can be a criminal prosecution that is successful on a certain set of facts. And I think it will make the jobs of distributors like Symphonic a lot easier,

because what we see right now when we approach clients to address these things, it's kind of like a prove it situation. And we've all developed Trust and Safety departments now and that's their job, is to look for anomalies in streaming, and really dig into our KYC[14] and KYB[15] measures.

We use identity verification, and we've very much bolstered that department. I see that happening industry-wide, where trust and safety wasn't necessarily a thing before, but since I've joined Symphonic, I've seen that grow with other competitors. And so, we all are responsible for doing it, but it's very hard. We are trying to find ways to pick out these anomalies and figure out exactly what's happening, compile the case, because we know that on the flip side of this, we also have contracts with our clients.[16] We've agreed to provide them services.

We only get so much data and analytics from our monetization partners,[17] and I understand why that's the case, but it makes it very hard for us to go to a client and penalize them or take away their services. And then, we get into a feedback loop that's very difficult for us to navigate at scale with a volume of clients who are unhappy because they've been called out for something, especially if you go back to my story at the top of this panel about my artist client who had this happen, not by his own choosing, but because someone was trying to sell him a service. And I'm not saying that's every case, but there's a lot of different avenues and entry points, and it's not always the artist who is driving it.

**Jon Glass:** Yeah, I think that we need multifaceted solutions to this problem. I think criminal prosecution is one. I think the digital service providers, the DSPs, who are really on the front lines of what is happening on their services, are much more attuned to the issue. And we rely on those relationships to figure out how DSPs are going to stop streaming fraud and make sure the pool of money that people like Michael Smith might have taken goes to the real artists, the real human artists. I think, in the beginning, we were seeing much more of the misidentification/mislabeling problem.

And DSPs started using content filtering to make sure that people weren't delivering content that might've been a sped up or slowed down version of one of our tracks or one of our tracks with its pitch shifted, which still happens today, but DSPs are attuned to it and have content filtering to block that. And just because we touched on AI, I would say that AI is a transformational technology that's going to be a great tool for human artists. I think though that it also can be used to help fraudsters in what had been their biggest hindrance in engaging in streaming fraud, the creation of content to be able to be artificially streamed later.

And now, because of the ease with which you can create thousands of tracks very quickly, it's just exacerbated the problem. But I think it takes a comprehensive approach to try to address it.

---

[14] Jorge Brea, *Fighting Streaming Fraud at the Distributor Level*, SYMPHONIC BLOG https://blog.symphonic.com/2024/06/17/fighting-streaming-fraud-at-the-distributor-level-2/#:~:text=At%20Symphonic%2C%20we%20started%20by,%E2%80%94%E2%80%94 (last visited Nov. 19, 2025).
[15] *Id.*
[16] Typically independent musical artists or their managers.
[17] DSPs (digital [music] service providers); *supra* note 10.

**Katherine Reilly:** I can just add something on. I think what has been exciting to see is how after the Smith charges were brought, there have been so many more efforts to sort of collaborate and bring tools that are, from my mind as a criminal lawyer and fraud prosecutor, like very much kind of normal everyday tools of the trade, but are very new, I think, in the music business, but to bring those to bear. So, I think Jon's absolutely right that there are people out there who have the tools to identify this.

And in fact, in the Smith case, one of the DSPs that he tried to do this with very quickly kicked him off the platform. And he was not on there for long. They identified what was happening. And he moved on to the next one where he went much longer. So, there's a degree to which some information sharing, I think, is beneficial. And that obviously is tricky because people are competitors and there are hurdles to information sharing. So, I don't mean to suggest that that's the be all and end all, but I know Patra's involved in Music Fights Fraud[18] and there are sort of increasing alliances and efforts to kind of bring best practices together, which I think is a real step forward.

And then, some of what I do now that I'm in private practice, is consult with people in this industry and say, "Look, if I was trying to assess fraud at a bank, an investment firm, a hospital, here's what I would look at. These are the indicators that this isn't a real account. This is the kind of behavior we would try to track." And I think in some cases, those are tools that are relatively new to people in this space. And it takes resources to put them together and to put them in place. So, it's not a small undertaking, but I think it is a problem that can be solved.

And the reality of criminal enforcement is, I think – I very much appreciated Patra's comments, and I think she's right, this case was important, but you're not going to prosecute 99.9% of streaming fraud. The point of this case, from my personal perspective, is to sort of put this out there and say, "This could be a crime, and it is deserving of everyone's attention and efforts."

**Aruni Soni:** Jon, what does coordination look like or collaboration look like with DSPs between – there are so many layers in the music industry, there's so many places where you can stop this. Are you guys talking about – is this an important part of like deals going forward? Yeah, tell us a little bit about that.

**Jon Glass:** Yeah, no problem. So, I think that we are as aligned with the DSPs as we have ever been because they're already getting a glut of content on their platform that's not very valuable to consumers, and there's hosting costs associated with that. And so, I think we're very aligned with them. It's a big issue, and we address it in our deals. I can't speak to how we do that, but I can speak to some public programs you're seeing announced by some of the DSPs. Spotify has announced that when they detect streaming fraud, they'll take the plays and disregard them. They won't give the plays any kind of chart credit or use in their algorithms.[19]

There's penalties per track that they impose if somebody's been engaging in streaming fraud. And if it's a repeated event, they might kick somebody off the platform. They might completely terminate their ability to put content on the platform. And Apple has announced and said publicly that they have a similar program. There's always a little

[18] MUSIC FIGHTS FRAUD ALLIANCE, https://musicfightsfraud.com/ (last visited Nov. 19, 2025).
[19] *All you need to know about artificial streaming*, SPOTIFY, https://artists.spotify.com/artificial-streaming (last visited Nov. 19, 2025).

bit of push and pull because the DSPs want to give us enough information so that we feel like they're addressing the problem, but they also don't want to give too much public information about how they detect this stuff. Because they're using different signals and it's sort of their secret sauce of figuring it out. But as Kate mentioned, they are figuring it out because they realize this is a big problem.

**Aruni Soni:** So, streaming fraud obviously has a lot of victims, but it doesn't necessarily punish everyone the same way or equally. Maybe inflated streams can help certain artists, more streams, more traffic is good for platforms. So, I want to ask you guys, how do you reconcile this uneven distribution of harm? Do you think there's a will across the industry to resolve a problem that may benefit some parties more than others? How do you navigate that tension?

**Patra Sinner:** That's a big question. I think, as an industry as a whole, we all have to be thinking about liability, where we fall on that chain of liability, and what our responsibilities are. Because at the end of the day, that piece of it is about money. Like you said, who benefits from that? Who's responsible for it? Who's liable for it? But on the other side of that coin is reputation. And I think that's something you can't really quantify as much, but it's something that we all have to think about because who wants to be that next distributor, label, or DSP tied to that storyline?

And I think Howie [Singer][20] and I were having a conversation about that this morning. No one wants to be that next person who's featured in that article who had that problem. Because then, you really are under the microscope, and what were you doing about this? What did it look like? What do your programs look like? How are you detecting? And I think if nothing else, that pulls us all together because I don't think any of us want to be willing participants in a fraudulent scheme that could hurt someone else. I think that at its basic core is true.

And I've had an opportunity to have a lot of conversations around that through the Music Fights Fraud Alliance,[21] whereas I feel like we were all operating in silos dealing with the same problems leading into that. And we still have to be very careful around it, which I think is why the Alliance is important because there's certain regulations and rules we have to be thinking about, our obligations to our clients, where we're trying to detect this. We still have to have some guardrails and protocols around how we do that, but I think we can talk about best practices.

I think we can talk in generalizations about what we're seeing and what to do about it. I think one of the important things about the Smith case that I wanted to highlight a little bit is there was legitimacy there. He was somebody, Kate, as you mentioned, who was a real active artist, producer, respected in the space. The AI company that he was primarily working with had the backing of others in the musical ecosystem. There was legitimacy behind that entity. And so, sometimes it's just, I think, very hard to look at a situation and think that's what's happening behind the scenes. But that's what we're faced with, asking critical questions sometimes where it may not be obvious.

**Katherine Reilly:** Yeah. I think the question of who's on the hook for streaming fraud is a really interesting one. And I can tell you that, when we came in from the outside and we're looking at the landscape, one of the questions we ask as prosecutors in any case is who did the thing, but also who knew the thing was happening and helped to

---

[20] Adjunct Professor, Music Business, NYU.
[21] MUSIC FIGHTS FRAUD ALLIANCE, https://musicfightsfraud.com/ (last visited Nov. 19, 2025).

facilitate it. And in the Smith case, I think Patra's right, there were lots of legitimate organizations that were involved in facilitating his conduct. And to me, as a criminal lawyer, one of the things that I hope the Smith case accomplishes, I'm optimistic given the movement of the industry, is, we charged Michael Smith.

And there were a number of individuals he worked with who were named – not named, but identified as co-conspirators in the indictment. But none of the other entities involved were charged, right? So, distributors, the DSPs, nobody else – his manager, nobody else was charged. I do think it is very much sort of a conceivable legal theory that some of those entities could have had criminal exposure, right? That they, the concept in criminal law of conscious avoidance or willful blindness, right, that you saw red flags and sort of actively took steps to avoiding understanding the implications of that.

I think that's a theory that could apply to other real players in the space. And I think, now stepping back to my role in private practice, I think it would've been irresponsible for prosecutors to charge that in a first of its kind criminal case. But as this becomes more prominent, that it could be criminal, that it is a problem, that people understand what the red flags are, I think there is real liability, both civil and criminal, for players who see the red flags and look the other way. So, I think that's a real, tangible, scary incentive, hopefully, to engage in these practices to try to root this stuff out.

**Jon Glass:** The only thing I would add is that, and we're going to get into it a little bit later, but the traditional streaming model has been a pooled revenue model where there's a pool of revenue that goes to rights holders and artists, and that gets divided up by the popularity of the content. Right? And so, when you're robbing some of that money, you're taking it from real artists who have made their careers on their human artistry. So, you're really robbing, it's stealing revenue from particular artists.

And I think that, for me, it's about human artists creating premium content, wherever that comes from. It can come from a major label, it can come from a distribution company through an individual artist. As long as those are the entities that are getting the pool of revenue, then I think that would be fair. But that's not how it really works. And we're talking about hundreds of millions to billions of dollars, as Aruni mentioned.

**Katherine Reilly:** And that's part of why this was allowed, I think, to go on for so long because the real victims are the artists, but each artist is losing fractions of a cent because of this streaming fraud. And artists have no visibility into any of this, right? They're the least well-positioned to identify fraud. So, it really takes someone taking a global picture or coming in from the outside, and those are not necessarily the people being ultimately financially harmed.

**Aruni Soni:** Let's talk about that, this streaming model, this pro-rata model, which kind of rewards volume over value. Do we need to rethink the streaming model as one way to combat streaming fraud?

**Jon Glass:** No, I think so. For, example, we've done some deals under the artist-centric model, which basically rewards more of the bucket of revenue going to real artists. And I think that has the ancillary benefit of discouraging streaming fraud because if there's not the pool of money necessarily that you can go after because you're not going to be able to get it, that would discourage you from doing that. And I think because of, like I said, given the volume of content that's being uploaded to platforms, figuring out a way to make sure that human artistry is rewarded is important.

We did a deal with Spotify that addressed the artist-centric model.[22] We've done a deal with SoundCloud a few years ago under the user-centric model, where instead of there being a pooled group of revenue, your actual subscription fee gets divided up by who you listen to.[23] So, if it's not pooled, again, that's discouraging a pool of revenue that could be taken by fraudsters. So, we're trying those things. It's rewarding human artistry, but it's also discouraging streaming fraud.

**Patra Sinner:** And I applaud those efforts. I think every effort that we make is a great step in the right direction. I do think, though, it's hard because fraud will adapt itself no matter what you do. And this was another great nugget that I got from Howie before this panel this morning. I think the storyline was, "Why do you rob banks?" And he said, "Because that's where the money is."[24] And it's true. I think that we can come up with creative and unique ideas to address this problem, and eventually, the fraud will catch up to it.

And we have to continue to adapt how we address it, and we have to continue to be vigilant about that. That's why I think it's important for groups like Music Fights Fraud Alliance to continue forward so that we can keep having real-time conversations around what we're seeing like, "Okay, we've adopted this new model." It's being adopted industry-wide, but then what? Then what happens next? And I think we just continue to drive those conversations forward to make sure we're prepared and ready to catch the next wave.

**Jon Glass:** Yeah. I would just add to that because Patra made a really good point. This is just one set of tools that will hopefully address the problem and make it smaller, but it's not the end all be all because people figure out a way to – when there's, again, hundreds of millions to billions of dollars at stake, they figure out a way to game the system. But I think that, like I said, the industry all around knows it's a big issue, and they know when they adopt new models, things might change. And so, they're keeping that in the forefront and we're keeping that in the forefront of all of our discussions and trying to help solve the problem.

**Katherine Reilly:** I think even efforts to evolve with the fraudsters go a long way. I think of this from the model of the financial services industry, which has teams and teams and teams of people, and millions and millions of dollars, devoted to trying to stay concurrent with or a step ahead of fraud. And they really have their own enforcement teams. And I think my sense, I'm newer to the music business than these guys, but my sense is for a long time, that didn't seem like something that needed to be a part of this business and I think maybe now it does. And I'll tell you, I was a cybercrime prosecutor for part of my career.

---

[22] *Warner Music Group and Spotify Announce New Multi-Year Agreement to Fuel Growth and Innovation*, WARNER MUSIC GROUP, https://www.wmg.com/news/warner-music-group-and-spotify-announce-new-multi-year-agreement-to-fuel-growth-and-innovation (last visited Nov. 19, 2025).

[23] Warner Music joins SoundCloud's user-generated royalties experiment, HYPEBOT, https://www.hypebot.com/hypebot/2022/07/warner-music-joins-soundclouds-user-generated-royalties-experiment.html (last visited Nov. 19, 2025).

[24] The quote is attributed to 1930s bank robber Willie Sutton. *See Willie Sutton*, FEDERAL BUREAU OF INVESTIGATION, https://www.fbi.gov/history/famous-cases/willie-sutton (last visited Nov. 19, 2025).

And one of the things I've seen since leaving government is a lot of the tools that are inherent in cybercrime like people acting from overseas, and using VPNs,[25] and using other ways to mask their location and identity, are now being used in streaming fraud because people started to realize that if one player is making too many claims, is posting too many songs that attracts attention, instead you can use different identities and different VPNs. And all of a sudden, now you look like hundreds of players posting it. That's an incredibly common tool in all forms of cybercrime, but now it's being put into place in streaming fraud.

And I think it's absolutely the case that fraud goes where the money is, and it's going to keep evolving, but having the tools in place like the financial services industry to try to keep pace with that is a big part of staying on top of it.

**Aruni Soni:** It sounds like what you guys are saying is that streaming fraud is going to become, or is, a feature of the industry. Do you guys agree with that? And I'd also love to hear more about MFFA from Patra. We talked about how you spot it. Let's talk about how you stop it.

**Patra Sinner:** Oh, I think that's also a very difficult question, but I do feel like we can learn from other industries. Kate, you just mentioned the financial services industry. I feel like the film industry is many years ahead of us in this fight, but they found ways to combat it. I think they also got the support of law enforcement and prosecutors, and were able to make cases that I think are of meaningful enough value to get attention. And I feel like that's one of the reasons that the Michael Smith case was able to garner attention –because it was one of the largest. We had a case in Denmark that was around the two million mark,[26] and there was one in Brazil recently that was around 65,000.[27]

And so, I was really surprised at the lower-level value of that one, that it was able to catch that kind of attention. I hope this isn't a feature of the music industry ecosystem. Of course, none of us want it to be, but I think as long as there's something to be gained from it, from a fraud standpoint, that, again, we just have to continue to be vigilant. And the Music Fights Fraud Alliance was born, I believe, during Indie Week in New York, in

---

[25] Virtual private network. VPNs can be used, for example, for accessing network resources within one country from a computer in another country. *See generally What is a VPN and How Does it Work? A Comprehensive Guide*, NETGEAR, https://www.netgear.com/hub/network/security/what-is-a-vpn/ (last visited Nov. 19, 2025).

[26] Miranda Bryant, *Danish man found guilty of fraudulently profiting from music streaming royalties*, THE GUARDIAN, https://www.theguardian.com/world/2024/mar/21/danish-man-found-guilty-of-fraudulently-profiting-from-music-streaming-royalties (last visited Nov. 19, 2025).

[27] *São Paulo Court Issues Another Ruling Against Streaming Fraud Under Operation Authentica*, IFPI, https://www.ifpi.org/sao-paulo-court-issues-another-ruling-against-streaming-fraud-under-operation-authentica/ (last visited Nov. 20, 2025).

2023.[28] Christine Barnum, who was at CD Baby at the time, had been kind of driving this initiative forward.[29]

And we brought in the NCFTA.[30] It's a cybercrime-type organization that has worked with the financial services industry and some others[, which acted] as sort of a governing body for the alliance to help us navigate the difficulty of bringing competitors together with monetization partners like DSPs. And some of those early conversations were really difficult. There was buildout of an API to try to collect information in an anonymized way that we could all try to benefit from. But how do you do that? What are the guardrails around it? You have to think about data privacy and lots of other unique issues.

And the conversations have continued to evolve. The group is growing. It started as this core group of distributors like us, and now it's expanded. And we've got labels coming in. We've got publishers and others who are within the music industry ecosystem. And so again, I think it just keeps driving the conversation forward about what's happening and what we can do about it. And I'm going to let you two speak more about what we can do about it.

**Jon Glass:** I think it's going to be a feature, a part of the streaming ecosystem, but hopefully, it's a diminishing one as time goes on. I think that Kate mentioned earlier in the *Michael Smith* case how he used family plans, it was the most cost-effective way for him to get a bunch of accounts to be able to engage in this activity. We've had an issue for family plans to have some kind of benefit. And so, we're always trying to protect the value of music and family plans as just something that it's really – there's really enforcement on the DSP side that they are real, true families.

So, I think there's a lot of things that we do that's an issue for us to protect the value of our music and our content that we try to address, but then also have the benefit of discouraging that kind of abuse for streaming fraud purposes. Again, we're not on the front lines, the DSPs really are, but I think the information sharing is important, as you mentioned because I think Michael Smith was another good example of how one DSP cut them off but another one kept going. But if they were sharing more information about seeing that streaming fraud, maybe they would have stopped the second DSP, or whoever it was, from continuing to allow this to happen.

So, I think those things are critical. And we do what we can in our deals to address the issue, whether it's hitting it directly head on or through an ancillary issue of value that we think we're missing out on.

**Katherine Reilly:** Yeah, I think maybe to pick up on two things. Just to talk about Music Fights Fraud and the NCFTA for a minute, because I think that is a really exciting opportunity that hopefully leads to more prevention. And I'm always a little hesitant in the last few months to say things about the Justice Department because it's rapidly changing and I never quite know where things are going. But in my 11 years in the

---

[28] *Music Platforms Unite to Form Industry-Wide Anti-Fraud Alliance, "Music Fights Fraud"*, TUNECORE, https://www.tunecore.com/press/music-platforms-unite-to-form-industry-wide-anti-fraud-alliance (last visited Nov. 20, 2025).

[29] Christine Barnum was Chief Revenue Officer of CD Baby, another independent digital music distributor, at the time of the Music Fights Fraud Alliance's launch.

[30] NATIONAL CYBER-FORENSICS & TRAINING ALLIANCE, https://www.ncfta.net/ (last visited Nov. 20, 2025).

Justice Department, what I can say about the core professional career people who work there, and I'll put the leadership of the Justice Department to the side for the moment.

There is a real understanding in law enforcement, and particularly in the FBI, which is generally what manages the NCFTA and has worked with Music Fights Fraud, that there are places where there is a need not just to be thinking about building cases, but to be thinking about how to best bring public and private partners together to prevent crime. And so, the organization Patra mentioned at NCFTA has had incredible success in the financial sector, working closely with the FBI and financial institutions, –not just to develop cases and bring charges, but to facilitate the sharing of information to get information early, so that the private sector partners can put a stop to misconduct before it rises to the level of a federal criminal prosecution. That has been, I think, tremendously successful in New York in the financial services business. And I think there's real potential here because it is absolutely the case that information sharing across competitors is tricky. Right?

But if you put an interlocutor like the FBI, that if people can trust them and think that they are not sort of rushing to bring a case, or to come in and take all your files and look at them but are actually going to be there to be helpful, they can do some of that work. And so, I think there really are very excellent people who want to be a part of that effort within law enforcement, and getting everybody to trust each other and work together is part of the challenge, but I think it can happen.

And then the other piece, picking up on something Jon said, is I think there are things that the DSPs in particular and other players in the industry can do at the front end to try to get at some of this stuff before it starts. And the fraudsters are going to evolve, they're going to find ways ahead, but the family plan thing is a great example. There are pretty easy ways to vet whether it's a real family or not, a real family, right? So, if bots are clicking from a family plan and someone's in the Philippines and someone's in Mexico, that's probably not a real family, or at least it bears taking a double check on what are the details behind it. And that can be resource intensive, but a lot of it can be automated.

Frankly, a lot of it can be done using AI. So, there are steps that can be taken to try to vet this stuff, and it's not going to stop it from happening, but I think it could reduce the incidents. And it makes the fraudsters evolve faster, it makes it harder for them, and you're going to kick some people out of doing it if you can do that.

**Jon Glass:** And I would just add that my interaction with the DSPs is that they are doing these things. They are trying to take proactive steps to stay ahead because they know the lifeblood of their service is the content that gets delivered to it, and to connect artists with their fans. And so, they know this, so I think that they're really focused on it and they're trying to do these things.

**Patra Sinner:** I think it puts me in the mind of why can't we have nice things? Because as independent distributors like us, we really want to be a champion of indie artists. Even though we have well-established clients, we also have those emerging artists who are kind of like the AAA [farm team] of the music industry. And you want to watch their trajectory and watch them grow, and they're there to be legitimate and do the right thing and grow themselves as artists. But then, you have others who are manipulating and using that system in a bad way.

And so, when you think about artists that come onto our platform, we use a system of identity verification called iDenfy,[31] and we pay for that, pay for each time we verify someone's identity, and think about that from the perspective of an artist who never generates enough income through us to actually pay for the identity verification piece of that. It's a net negative for us, but we still need to do it. And I think if we could all get more uniform in that process of really looking at it from a base level, I think the KYC, KYB, and content integrity components of this will have a pretty significant impact.

**Aruni Soni:** Katherine, I also wanted to ask you, since music streaming in the digital age is so global, what challenges are there in enforcing or stopping streaming fraud?

**Katherine Reilly:** Yeah. So, look, in the *Michael Smith* case, we had the benefit that he was here [in the United States], right? And so, it was much easier to collect the information we needed, and ultimately it meant that he could be arrested and face charges here. There are a lot of challenges if the actors are abroad. One is, and this is true in huge swaths of cybercrime, there are countries in the world where even if we can identify who's doing the crime, we have no real hope of bringing them to the United States to face justice. Right? So, a lot of cybercrime happens in countries like that. And you can bring charges, you can show the world that you know what happened, that you know who did it, and there's some value to that.

But at the end of the day, nobody's coming here to stand trial. The other, I think, more technical challenge in cases like this is where data is hosted abroad that you need to build these cases. So, without speaking to the specific techniques used in the Smith case, if you're using email accounts and you're on Google, you can do a search warrant at Google. You can get internet access records from the service provider. And that's all the more relevant where someone's trying to hide where they're accessing the internet. When those records are hosted abroad, they're much more complicated to get. And it doesn't mean that you can't get them, right?

The United States has relationships with law enforcement in lots of countries, and they do get records and evidence all the time, but it's incredibly time-consuming, it can be incredibly costly, and it's a real deterrent, I think, to putting together a complicated, data-driven case, which any music streaming fraud case is going to be. So, I think that is a real challenge to criminal prosecution. But to go back to where I started, I think criminal prosecution is not the future of music streaming fraud. It's going to be the rare case that rises to the level of a federal crime.

And frankly, federal criminal law is much better designed to tackle this than state or local laws. But the Smith case was both the first and a big one. I think there could be more like that. It's not to say that we won't see cases like this, but I think it's much more likely that that is used as an example in other players in the space taking action.

**Aruni Soni:** Well, do you guys have any final thoughts, predictions for the future before we open it up to questions?

**Jon Glass:** I'm just happy that the Copyright Society decided to do a panel on this topic because I think it, as you hopefully can understand from our comments, is a serious issue and it needs to be addressed, and especially in the era of easy content creation through GenAI platforms. So, it's a topic that we're going to continue to address at our

---

[31] iDENTY, https://www.idenfy.com/.

company and make sure that real human artists are getting the appropriate compensation that they're supposed to get from the streaming services.

**Patra Sinner:** I'll just add, too, I think making the connection between fraud and AI is not what we want to do. I don't think there's been any specific mandates yet from any of our partners that they don't accept AI content. And I think that conversation will continue to evolve over time as they, DSPs and monetization partners, decide what guardrails they may want to put or any limitations around that. But we don't necessarily want to make the leap that everyone who's using AI is using it for some type of fraudulent purpose. That's not what we think. But I do see from a volume perspective how it can be used for that, but not everyone is using it for that.

**Katherine Reilly:** Yeah. I think that's a really good point, and one we hadn't really touched on yet. When we talked about the *Michael Smith* case, we didn't want to be in the business of saying what music is or isn't. Right? That is very clearly a First Amendment issue and an issue that criminal prosecutors, in my mind, have no business dealing with. So, the fact that the content was created using AI was not in any way sufficient to the bringing of charges. And it goes back to where I started with the affirmative misrepresentations, I think, really put this case over the edge.

But it does make it more complicated, I think, to discern what's what. I will say what I find most exciting about this area is – and I think this conference is a great example. This is a place where I think we need people coming from lots of different perspectives. Right? So, copyright expertise, music industry expertise, in my mind, fraud expertise, these are not groups that are always talking to each other. And I'll give him a little shout out. In my family, my husband is the copyright lawyer. He's speaking on the next panel. And so, I think the notion that I would be qualified to speak at a copyright conference is sort of laughable to the people I live at home with.

But I think what's interesting about it is this is a place where you need people from a lot of different perspectives. And when I came into this a couple of years ago, I didn't know anything about royalties and how music gets on streaming platforms. And I had to learn that. And the people I deal with in the music industry don't know anything about how you vet fraud from the outset. Right? And so, there's a conversation that I think is happening now and needs to continue because these are really different specialties and different perspectives that need to come together.

**Patra Sinner:** Yeah, I totally agree with that. I think these conversations are what soften out the edges of what we as a society can live with. I think the legal system moves slowly in creating law or setting precedent, but these are the conversations that we can have that ultimately end up influencing those decisions, and we do that by educating each other on our different perspectives.

**Aruni Soni:** Thank you guys so much. I'd like to open it up for questions from the audience, if anybody has any. Do you need a mic?

**Participant 1:** My name is Kishi Shamsi, I'm at [UC] Berkeley Law School. My question is, I know Spotify might have been toying with the idea of taking streaming numbers off so that people can't see the number of streams. And the way that things have been, I guess content creation is now all about numbers. Right? So, it's all about how many streams can I get?

And I know for smaller artists, the big pressure is, "If I have – if my page looks like it has 30,000 streams, right, that will attract a real audience because people will be like,

'Wow, she's so good. She has 30,000 streams.' So, it doesn't matter which way I get those streams. It just matters about the fact that, that number is nice and pretty and looks there." And if you get rid of that number, does that help with the situation that we're talking about? Because I know we're talking about backend stuff, but on the front end, would it make artists less susceptible to using these platforms to get that number and to make it look like they have this following that they don't necessarily have yet?

**Patra Sinner:** I think it would depend on what your motivation is. If your motivation is money, you won't care about that. If your motivation is the public appearance of doing really well, or maybe moving from a distributor like us to a label like Warner because that's your goal, I think it depends on why you want that number.

**Jon Glass:** Yeah. No, I agree. But I think it would, if I was – I think it would harm artists more – the real artists more because, we use those kinds of figures to figure out who's an emerging artist who we might want to sign. And I wouldn't want stream counts, and followings, and things like that to come off platforms where we can't use the tools and, to your point, not connecting that artist to a group of fans. And I just feel I guess it really does depend on the motivation, but I just don't think that would – I think it would do more – personally, I think that would do more harm than good.

**Patra Sinner:** I think it's an interesting question though because the host of that content, like for us as a distributor, we would still get the data and analytics behind the scenes because that's how you pay the royalties. We would still get the information, it just wouldn't be publicly available. So, it could, to some extent, I guess, discourage based on what your motivation is for doing it.

**Participant 1:** Because it kind of goes back to the way we used to consume music. We didn't know how much, how many people bought an album or a vinyl, like a CD. We'd go to a CD store, and I wouldn't be like, "Oh, my God, 30,000 people bought this album. I'm gonna buy it". Yeah, you just didn't do that. You looked at the cover, and you were like, "Oh, I like this cover. I like this artist. I like the vibe." And would it be – would it make sense to go back to that kind of time where we were –

**Patra Sinner:** You might have learned about those artists from radio too, though, during that time. So, I don't know. I think everything's worth a try if Spotify is willing to make that effort. I think they probably float ideas to see because in addition to combating fraud, I think you also have to think about from a business perspective, what do your legitimate clients and consumers want? So, you can't just solely make decisions based off of fraud. They probably want to see, "Are we going to get backlash for this? Do people hate it? Do they love it? Is this a good thing or a bad thing for us?" And sometimes I think you have to make that, test that ground before you roll something out because that's a big deal.

**Aruni Soni:** Okay. Maybe one more question. In the back, I'll come back to you.

**Participant 2:** Hi, Bill Colitre, Music Reports.[32] Ms. Sinner noted how difficult it is at the on-ramp to do the KYC to get people verified before they're allowed to upload music, costly for each person to do that, who's at that front end where she is. Ms. Reilly mentioned how difficult, how valuable it is to share information across platforms and to do things on a platform-wide basis. This may be a radical idea, but 140 years on, should

[32] Bill Colitre is Chief Operating Officer of Music Reports, a music rights management service provider. *See* MUSIC REPORTS, https://www.musicreports.com/ (last visited Nov. 20, 2025).

we reverse course on the Berne Convention and go back to registration as a formality that's required in order for people to have access to the global copyright system?

**Patra Sinner:** Again, I think making big sweeping changes that are difficult to enact and difficult to enforce, difficult, think how much buy-in you would need to make something like that happen. And I'm all for creative ideas, but big overhauls and sweeping changes like that, that require a lot of different societies and individuals and corporations to buy into them, I think they're fun to talk about, but maybe just not necessarily practical to implement.

**Participant 2:** I just note that once upon a time, registration provisions were used as a way to victimize artists, but now artists are being victimized by the lack of a reliable registration. It just seems like nowadays with computer technology, it's vastly easier to register something. I register for things all day long with my computer.

**Patra Sinner:** But I think if you think about our client base as an independent – for independent artists all the way up to very established labels for our indie artist community, they're all over the globe. Some of them don't even have internet access at home. They really are very emerging artists who often, we see some great success stories out of that. And I don't know that they would have the capability of making that happen. We could eliminate access for a lot of indie artists if we did that.

**Participant 3**: I'll just add to what Bill [Colitre] said. I'm Daan Archer, Copyright Delta. So CISAC, the umbrella organization of the societies, now has a mandate for all societies to implement KYC since three months.[33] So, it might be going that direction. The question I would like to ask is, do you already use AI to detect fraud online? That could be AI for good. Have you seen cases of that?

**Patra Sinner:** We have a Trust and Safety department, and just like our monetization partners, I don't think any of us will talk very specifically about exactly what we're using for detection. But I'm sure we have all different types of tools that we use and that our monetization partners use.

**Katherine Reilly:** One of the challenges, I think, just to quickly say because I don't have a Trust and Safety department, so I can say lots of industries, including this one, can use AI to do detection. But at the end of the day, AI is only going to get you so far, and there's real sort of digging in on problems [that's necessary]. Right? [AI can]flag things, but then someone has to look at it. And that is very resource intensive. And so, I think that is asking a lot and a real shift for the industry to figure out what resources they can put behind even something that starts with AI.

---

[33] *CISAC's 2025 Annual Report spotlights AI advocacy, anti-fraud frameworks, and CIS-Net technology renewal*, INTERNATIONAL CONFEDERATION OF SOCIETIES OF AUTHORS AND COMPOSERS, https://www.cisac.org/Newsroom/news-releases/cisacs-2025-annual-report-spotlights-ai-advocacy-anti-fraud-frameworks-and (last visited Nov. 20, 2025); *see also CISAC Annual Report 2025*, INTERNATIONAL CONFEDERATION OF SOCIETIES OF AUTHORS AND COMPOSERS, https://iprs.org/wp-content/uploads/AG25-0354_CISAC_Annual_Report_2025_2025-05-22_EN.pdf (last visited Nov. 20, 2025).